**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

Kathy Frazier, Yared Abraham, O. Emmanuel
Adepoju-Grace, Andrew Clark, Kwesi Coleman,
Jeanna Pryor, and Aisha Rada, on behalf of
themselves and all others similarly situated,

          Plaintiffs,

    v.

Morgan Stanley & Co. LLC, Morgan Stanley Smith
Barney LLC, and Morgan Stanley,

          Defendants.

Case No.  16-cv-00804 (RJS)

**Judge Richard J. Sullivan**

**Jury Trial Demanded**

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kathy Frazier, Yared Abraham, O. Emmanuel Adepoju-Grace, Andrew Clark,

Kwesi Coleman, Jeanna Pryor, and Aisha Rada, on behalf of themselves and all others similarly

situated, by and through their attorneys, Stowell & Friedman, Ltd., hereby file this Third

Amended Class Action Complaint against Defendants Morgan Stanley & Co. LLC, Morgan

Stanley Smith Barney LLC, and Morgan Stanley (collectively "Defendant," "Morgan Stanley" or

"the Firm"), and state as follows:

## NATURE OF THE ACTION

1.      Morgan Stanley is one of the world's largest providers of financial services.  The

Firm employs over 16,000 registered brokers, called Financial Advisors ("FAs"),[1] who provide

---

[1] As used herein, the terms "Financial Advisor" and "FA" include tenured FAs as well as FA trainees,
given a number of titles by Defendant over the class period, such as Financial Advisor Associates,
Registered Financial Advisor Trainees, Wealth Advisory Associates, Private Banking Advisory
Associates, and Resident Financial Advisors.  The terms "Financial Advisor" and "FA" also include
"producing" managers, *i.e.*, those given manager titles or responsibilities but who also maintain a retail

*(Footnote cont'd on next page)*

wealth management services and serve as the face of Morgan Stanley to its individual and institutional clients.  Compensation and advancement opportunities available to Morgan Stanley FAs, however, vary widely depending on their race, as African Americans are systemically denied equal employment opportunities.

2.      African Americans are underrepresented as FAs and in management at Morgan Stanley and are paid substantially less than their counterparts who are not African American. These disparities result from Morgan Stanley's systemic, intentional race discrimination and from policies and practices that serve no reasonable business purpose yet have a disparate impact on African Americans and segregate Morgan Stanley's workforce by race.

3.      Morgan Stanley has long been aware of the dramatic underrepresentation, higher rates of attrition, and lower compensation of its African American FAs.  Rather than devote its resources toward reform and end its entrenched discrimination, however, Morgan Stanley quietly sought to limit liability for its wrongs by forcing its employees to arbitrate their disputes and waive class actions.  This attempted end-run around the civil rights laws would deny Morgan Stanley employees the right to join together to challenge the Firm's unlawful conduct.

4.      Plaintiffs file this lawsuit to achieve meaningful reform and to hold Morgan Stanley accountable, finally, for its unabated, unlawful treatment of African Americans.  This lawsuit is brought by Plaintiffs on behalf of themselves and other African American Morgan Stanley FAs who work or worked for the Firm and have been harmed by its company-wide pattern or practice of race discrimination and discriminatory policies and practices.  This action seeks to make class members whole and to provide class-wide injunctive relief to end Morgan

---

*(Footnote cont'd from previous page.)*

brokerage book of business.

2

Stanley's discriminatory practices.

## JURISDICTION AND VENUE

5.      The claims of Plaintiffs and the putative class arise under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq*. ("Title VII"),[2] and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. § 2000e-5(f)(3).  Defendant maintains its corporate headquarters and principal place of business in this District, in which the unlawful policies and practices challenged by this lawsuit were created, implemented, and monitored.  Defendant is licensed to do business and maintains a number of branch offices in this District and services clients who are residents of this District.  The unlawful conduct alleged in this Complaint occurred in this District and across the United States, and harmed members of the putative class who worked for Morgan Stanley and reside in this District.

## PARTIES

7.      Defendant Morgan Stanley is a publicly traded, global financial services firm and Fortune 500 company incorporated in Delaware and headquartered in New York.  As part of its wealth management services, Morgan Stanley employs more than 16,000 persons nationwide as FAs to service clients across the United States.  Morgan Stanley is registered with the Securities and Exchange Commission ("SEC") as a broker-dealer and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant.  In 2015, Morgan Stanley's wealth

---

[2] Plaintiffs Kwesi Coleman, Jeanna Pryor, and Aisha Rada have filed representative charges of discrimination with the EEOC but have not yet received Notices of Right To Sue.  After exhausting their administrative remedies, these Plaintiffs will seek leave to amend this complaint to add their Title VII claims and to represent the putative Title VII class.

management business managed $2 trillion in client assets, and achieved a 22% profit margin.

8.      Plaintiff Kathy Frazier ("Frazier") is African American and resides in California. Frazier was employed by Morgan Stanley as an FA in the Honolulu, Hawaii branch office from 2007 until November 2013.

9.      Plaintiff Yared Abraham ("Abraham") is African American and resides in Oregon.  Abraham was employed by Morgan Stanley as an FA in the Honolulu, Hawaii branch office from 2008 until October 2013.

10.     Plaintiff O. Emmanuel Adepoju-Grace ("Adepoju-Grace") is African American and resides in Delaware.  Adepoju-Grace was employed by Morgan Stanley as an FA in the Wilmington and Hockessin, Delaware branch offices from 2012 until September 2013.

11.     Plaintiff Andrew Clark ("Clark") is African American and resides in Washington D.C.  Clark was employed by Morgan Stanley as an FA in the Washington, D.C. branch office from 2013 until May 2015.

12.     Plaintiff Kwesi Coleman ("Coleman") is African American and resides in Colorado.  Coleman has been employed by Morgan Stanley as an FA in the Denver, Colorado branch office since late 2012.

13.     Plaintiff Jeanna Pryor ("Pryor") is African American and resides in Maryland. Pryor was employed by Morgan Stanley as an FA in the Washington, D.C. and LaPlata, Maryland branch offices from 2013 until January 2016.

14.     Plaintiff Aisha Rada ("Rada") is African American and resides in Illinois.  Rada was employed by Morgan Stanley as an FA in the Pittsburgh, Pennsylvania branch office from 2014 until November 2015.

## FACTUAL BACKGROUND

**Morgan Stanley's Legacy of Discrimination and Recent Attempts to End Legal Liability**

15.     Morgan Stanley has a long history of systemic discrimination against its brokerage workforce.  As a result, the EEOC and female and minority employees have sought to hold Morgan Stanley accountable in legal proceedings.

16.     In the 1970s, the Equal Employment Opportunity Commission ("EEOC") sued Morgan Stanley's predecessor, Dean Witter, for engaging in a class-wide pattern and practice of race and sex discrimination with respect to recruitment, hiring, assignment, training, promotion, and other terms and conditions of broker employment.  *See EEOC v. Dean Witter & Co, Inc.*, Case No. 78-839 (E.D. Pa.).  In 2001, the EEOC again sued Morgan Stanley on behalf of a class of female sales employees, alleging that Morgan Stanley failed fairly to promote and compensate women in violation of Title VII.   Morgan Stanley resolved the case in July 2004 by agreeing to a consent decree that required the Firm to pay $54 million.  *EEOC/Schieffelin v. Morgan Stanley & Co.*, 01-CIV-8421 (S.D.N.Y.).

17.     After decades with no meaningful progress, in June 2006, female Morgan Stanley FAs challenged unequal pay and account distributions in the class action sex discrimination lawsuit *Augst-Johnson v. Morgan Stanley & Co.*, No. 06-cv-1142 (D.D.C.).  In April 2007, Morgan Stanley agreed to settle the *Augst-Johnson* case for $46 million.

18.     Around the same time, a group of 14 current and former African American Morgan Stanley FAs had notified Morgan Stanley of the pattern and practice of discrimination they had suffered at the Firm.  Morgan Stanley pretended to negotiate meaningful policy reforms in good faith with this group of committed employees.  In reality, however, the Firm secretly negotiated to transform a dormant putative gender discrimination class action into a race, color

and national origin class action settlement, *Jaffe v. Morgan Stanley & Co.*, No. 3:06-cv-03903-TEH (N.D. Cal.).  The only class representative at the time did not attend the mediation, rejected the settlement, and was replaced by another African American former employee who received $125,000 to resolve her arguably time-barred individual claims.  Latinos were added to the *Jaffe* settlement class without the presence or participation of a Latino class representative.  In October 2007, Morgan Stanley announced it would settle the transformed *Jaffe* case for $16 million, to be distributed among a class of 1,300 African American and Latino employees.  Over substantial opposition and after numerous hearings, the *Jaffe* Court ultimately approved the settlement, relying in part on the programmatic relief that the parties represented would improve opportunities for African American (and Latino) FAs.[3]  In the Settlement, the parties barred class members from gaining access to the *Jaffe* Court or seeking to enforce the Settlement's terms.  After approval, the parties made no appearance before the *Jaffe* Court to enforce the Settlement nor provided it with any reports regarding the Firm's compliance with the programmatic relief of the Settlement.  The programmatic relief in both the *Augst-Johnson* and *Jaffe* settlements was to expire on September 30, 2015.

19.     The reforms in the *Jaffe* settlement have failed, and Morgan Stanley's discriminatory policies and practices continue in full force.  Indeed, Morgan Stanley has not complied with the consent decrees and programmatic relief to which it agreed in two nationwide class action settlements, the race and color *Jaffe* settlement or the sex discrimination *Augst-Johnson* settlement.  African American FAs remain excluded from the Firm's racially segregated

---

[3] That the *Jaffe* settlement undervalued the claims was plain after the settlement, when a nearly identical class action lawsuit against Morgan Stanley's competitor Merrill Lynch was settled for $160 million, ten times the $16 million *Jaffe* settlement, for the same number of class members.  *See McReynolds v. Merrill Lynch*, Case No. 05-cv-6583, Dkt. 585-1, VIII.A.; 616 (N.D. Ill.).

partnerships or teams (hereinafter referred to as "teams") and continue to have substantially lower earnings and higher attrition than white FAs.  Morgan Stanley's performance is so abysmal that it has agreed to extend certain aspects of the programmatic relief and consent decrees in the *Jaffe* and *Augst-Johnson* cases for an additional two years.  *Jaffe*, No. 3:06-cv-03903, Dkt. 300; *Augst-Johnson*, No. 06-cv-1142, Dkt. 77.  *See also Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 415-16 (7th Cir. 1988) (violation of agreement settling discrimination case could create inference of discrimination).

20.    Morgan Stanley has no genuine intent to reform, to provide equal opportunities to African Americans, or to abide by the spirit of its agreements in the *Jaffe* and *Augst-Johnson* cases.  To the contrary, at the same time that Morgan Stanley agreed to extend the consent decrees, in an effort to preclude further legal action, it embarked on a plan to deny its employees access to court for civil rights violations and to deny its employees any ability to join together in any forum to challenge firm-wide discrimination or achieve injunctive relief.

21.    In September 2015, Morgan Stanley Human Resources sent a misleading and incomplete e-mail to its FA workforce titled "Expansion of CARE Arbitration Program."  Morgan Stanley intends that by failing to notice or respond to this e-mail, employees will lose their right to sue Morgan Stanley in court or ever prosecute or participate in a class or collective action in any forum.  However, Morgan Stanley's e-mail does not inform employees that they will lose their right to pursue claims of discrimination in court, or even mention discrimination or civil rights claims.  The e-mail only mentions arbitration of certain unspecified claims.  Nor does the e-mail inform employees that they are being forced – without compensation or consideration – to waive and forego forever their right to join with other employees or participate in any class action, in arbitration or court, challenging Morgan Stanley's policies and practices.  That

information can be gleaned only by clicking on a link and then making it to page 19 of the Firm's 22-page "CARE Guidebook."

22.     Consistent with the Firm's design, the e-mail went unnoticed by most employees and understood by even fewer of those who waded through the Firm's misleading disclosures.

23.     The timing on the extension of the consent decrees and the implementation of mandatory arbitration and class action bans is not coincidental but a calculated attempt by Morgan Stanley to continue its rampant discrimination in private and without challenge or accountability in the Court or notice by the investing public.  If enforced, mandatory arbitration and class action waivers will ensure that no other court will have the authority or jurisdiction to enter or oversee programmatic or class-wide injunctive relief.[4]

24.     On September 30, 2015, the Court entered an order to continue the *Jaffe* Settlement's Programmatic Relief and to maintain jurisdiction to enforce the Settlement.  At no time in presenting this Motion did Morgan Stanley inform the Court that it had interfered with class members' civil rights or access to court.  The parties' stipulation also ended the Diversity Monitor's review and oversight of individual complaints of discrimination.

25.     Morgan Stanley fought Plaintiff Frazier's attempt to address its violations of the *Jaffe* Settlement, first by opposing her motion to deem this lawsuit related to the *Jaffe* race discrimination lawsuit and have it heard by the *Jaffe* Court.  After that effort was successful, Morgan Stanley then challenged Frazier's right to seek relief for Morgan Stanley's violations of the *Jaffe* consent decree by asking this Court to dismiss her *Jaffe*-related claim, arguing only class counsel could enforce the settlement (and only before the *Jaffe* court).

---

[4] Plaintiffs contend Morgan Stanley's attempted CARE revisions are unenforceable, at least with regard to civil rights claims.

**Morgan Stanley's Racially Hostile Culture and Work Environment**

26.     Morgan Stanley maintains a racially biased corporate culture replete with harmful stereotypes about African American FAs.  The Firm also maintains race-based attitudes about its clients by assuming that wealthy white clients and prospective clients will not entrust their finances to African American FAs.  Morgan Stanley's culture is embedded in its employment practices and decision-making, as the Firm systematically favors and steers business opportunities and resources to white FAs, with disastrous results for African Americans.

27.     As a result of Morgan Stanley's preconceptions about African American FAs, the Firm hires very few African Americans.  Those hired generally work in offices where they are the only African American FA or one of very few African American FAs.  Due to the Firm's discriminatory policies and practices, there is a very high rate of attrition for African American FAs, particularly in the Firm's training program.  This high attrition creates a revolving door of African American FAs and reinforces the Firm's stereotyped view that African Americans are incapable of succeeding in the financial services industry.  This in turn reinforces the Firm's belief that business opportunities, resources, and support should be reserved for non-African Americans FAs, rather than African Americans who are likely on their way out of the Firm.

28.     This Firm's culture creates a hostile work environment in which racial segregation and disparate treatment are condoned and perpetuated.  African American FAs are not presumed competent or expected to succeed and, therefore, are isolated, marginalized, and ignored, if not worse.  African Americans are often treated with disrespect and experience a hostile work environment in Morgan Stanley's branch offices.  Although the Firm pays lip service to the values of diversity and inclusion, its commitment to those values is illusory.  The experiences of African American FAs differ markedly from those of non-African Americans, and the impact of race in their offices is apparent.  For example:

- A manager acknowledged that "some clients just don't want black brokers," or words to that effect, and then reassigned the client account to a white male FA.

- A senior white male FA candidly admitted the reason for Morgan Stanley's differential treatment of African American FAs when he told one of the Plaintiffs this is "a white man's business," and African American FAs need to be able to "market to people [they] could relate to" (referring to African American prospective clients), or words to that effect.

- Management openly acknowledged Morgan Stanley's lack of diversity in its FA and client population, and often sought to steer African Americans toward African American clients, prospects, and events.  Indeed, managers often communicated with African American FAs solely in connection with minority events or organizations, requiring them to represent the Firm at "diversity" functions.

- Senior white, male employees publicly referred to African American FAs in derogatory terms such as "Popolo," a Hawaiian slur meaning a black person, without negative repercussions from the Firm.

- Caucasian employees used inappropriate racial stereotypes in describing African American FAs.  For example, African American FAs were falsely accused of being "lazy" and "dishonest."

- African Americans were frequently and openly referred to as "the token black," "the skinny black man" or "the black lady," rather than by their names.

- A senior official of Morgan Stanley has repeatedly boasted in speeches to FAs that he speaks with the African American office cleaners, whom he called "the African American help."

29.     Morgan Stanley's stereotypical views about the skills, abilities, and potential of African American FAs infect the policies and practices challenged by this lawsuit, and result in the systematic segregation and differential treatment of African American FAs.

**Morgan Stanley's Systemic Race Discrimination Against African Americans**

30.     Morgan Stanley is engaged in a nationwide pattern and practice of intentional race discrimination and knowingly employs company-wide policies and practices that have a disparate impact on African Americans.

31.     Morgan Stanley maintains strict, centralized control over its wealth management business from its company headquarters, where an all-white team of senior executives issues mandatory company policies that apply to all members of the Morgan Stanley FA workforce. These include uniform, Firm-wide policies and practices that govern the Morgan Stanley FA training program, compensation plans, the formation and treatment of FA teams and pools, and the transfer and distribution of Firm resources and business opportunities, such as client accounts, leads, and referrals.

32.     The FAs who work at Morgan Stanley's branch offices across the country advise and service the Firm's clients.  FAs are supervised by branch or complex managers who implement the Firm's company-wide policies and distribute resources and business opportunities to FAs.  As a result of Defendant's systemic discrimination, African Americans are nearly excluded from branch and complex management and represent considerably less than 5% of the FA workforce.

33.     FAs obtain clients in a number of ways, including through the FA's own efforts, transfers from other FAs, membership in a team (or partnership) of FAs, the distribution of accounts when an FA retires or leaves the Firm, and the assignment of accounts, leads, referrals,

walk-ins, call-ins, and other business opportunities distributed by the Firm.  Morgan Stanley
provides FAs with essential resources and sales, administrative, and management support.

34.     Morgan Stanley compensates its FAs pursuant to uniform, nationwide
compensation plans centrally issued every year.  FA compensation is based on the commissions
generated from the client accounts that comprise an FA's "book of business."  Due to the
commission-based and cumulative advantage systems under which FAs are evaluated and
compensated, a level playing field and fair distribution of resources and business opportunities is
essential.  Morgan Stanley's policies and practices regarding the distribution of resources and
business opportunities do not create a level playing field for African Americans, however, but
result in significant racial disparities in compensation and attrition.

35.     Morgan Stanley has designed, implemented, and maintains uniform, company-
wide policies and practices regarding the Firm's FA training program, teaming and pooling
among FAs, and the assignment of business opportunities, resources, and support that segregate
its workforce and discriminate against African Americans.  These policies and practices have a
disparate impact on African Americans that is not justified by business necessity.

36.     Under Morgan Stanley's teaming and pooling policies and practices, FAs are
permitted to form teams with FAs of their choosing and combine their client accounts and books
of business, subject to management approval.  Morgan Stanley encourages the formation of
teams and confers special policy advantages, resources, and benefits on teams and FAs on teams.
Team members can receive credit for client accounts and production credits they did not
generate, and teams and pools steer client assets, production credits, and business opportunities
to FAs and FA Trainees who would not otherwise receive these assets and opportunities.
Morgan Stanley teams are highly segregated by race, and African American FAs are almost

entirely excluded from favorable teams and pools and the resources and opportunities they provide.  As a result of racial stereotypes and discrimination, the skills and contributions of African American FAs are not valued, and they are not selected or permitted to join teams and pools as equal partners, to their distinct disadvantage under the Firm's policies.

37.    Morgan Stanley employs account transfer and distribution policies, including its Account Redistribution Policy and Power Rankings, that disproportionately steer lucrative business opportunities to FAs and FA Trainees who are not African American.  Under this policy, FAs who are not African American receive more client accounts in terms of asset size and productivity.  Disproportionately white FAs then also receive the future growth and further leads and referrals that result from these account transfers.  These transfers also improve their standing in the Firm's rankings and entitle them to even more preferential treatment in the form of additional account transfers, Firm resources, and business opportunities.  The Morgan Stanley Account Redistribution Policy discriminates against African American FAs by, among other things: (1) distributing lucrative client accounts to FAs based on membership in teams and pools, from which African Americans are largely excluded, and (2) relying on factors that have a disparate impact on African Americans and disproportionately benefit white FAs, including "by prescribing criteria that favor the already successful – those who may owe their success to having been invited to join a successful or promising team."  *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012).

38.    The Former Advisor Program similarly harms and has a disparate impact on African Americans by excluding them from inheriting the most lucrative client accounts – those of retiring FAs who will not compete for the accounts – and segregating African Americans from the most favorable teams – those designed for purposes of succession planning.

Morgan Stanley's policies and practices encourage and incentivize FAs to select and team with other FAs to whom they will distribute their entire books of business upon retirement. The Firm does not ensure that these teams and the corresponding client account transfers are not racially discriminatory. As a result, based on racial bias and stereotypes, African American FAs are effectively shut out of very large client account transfers and then forced to compete with the FAs who inherit these books of business.

39.    Excluding African American FAs from favorable teaming and account distribution opportunities leads to racial disparities in account distributions, compensation, attrition, and many other terms and conditions of employment. As Judge Posner of the Seventh Circuit Court of Appeals explained in ordering class certification in a nearly identical case:

> [I]f as a result of racial preference at the team level black brokers . . . find it hard to join teams, or at least good teams, and as a result don't generate as much revenue or attract and retain as many clients as white brokers do, then they will not do well in the competition for account distributions either; and a kind of vicious cycle will set in.

*McReynolds*, 672 F.3d at 489-90.

40.    In sum, Morgan Stanley has and is engaged in an ongoing nationwide pattern and practice of race discrimination and knowingly employs company-wide policies and practices that have a disparate impact on African Americans. The Firm's systemic discrimination against African Americans includes, but is not limited to, the following employment practices:

a)  Employing Firm-wide discriminatory hiring, recruitment, testing, and selection practices that disadvantage African Americans;

b)  Employing Firm-wide teaming and pooling policies and practices that disadvantage African Americans and that disproportionately exclude African Americans from participation in lucrative teams and pools and result in a segregated workforce and substantial racial disparities in earnings and attrition;

c)  Employing Firm-wide account transfer, distribution, and redistribution policies and practices that disproportionately steer lucrative client

14

accounts and other business opportunities to FAs and FA Trainees who are not African American;

d)  Employing Firm-wide training policies and practices that discriminate against African Americans and rely on factors that disproportionately harm African American FA Trainees;

e)  Employing Firm-wide cumulative advantage and other policies and practices regarding the assignment of resources, business opportunities, and sales, administrative, and management support that disadvantage African Americans and steer resources, support, and income-generating opportunities to white men;

f)  Employing Firm-wide compensation policies and practices that disadvantage African Americans.

41.     The intentional and disparate-impact discrimination described above is ongoing and constitutes a continuing violation of the civil rights laws.

42.     The racially discriminatory policies and practices at Morgan Stanley are uniform and national in scope.  Class members relying on Plaintiffs to protect their rights work or worked at Morgan Stanley offices across the country and were harmed by these same policies and practices.

**Plaintiffs Have Been Subjected To Morgan Stanley's Unlawful Conduct**

**Kathy Frazier**

43.     Plaintiff Kathy Frazier is an African American female who was employed by Morgan Stanley as an FA in the Honolulu, Hawaii branch office from 2007 until she was constructively discharged in November 2013.

44.     Frazier was well qualified to succeed at Morgan Stanley.  Frazier earned a BA in Economics from Amherst College and a Master's degree in Business Administration ("MBA") from the University of Pennsylvania's Wharton School of Business.  She also had substantial financial services experience, having worked at Goldman Sachs and Merrill Lynch.  Indeed, Frazier was a successful FA at Merrill Lynch when Morgan Stanley recruited her in 2007.

45.     Despite her outstanding credentials and performance, Frazier was subjected to and harmed by Morgan Stanley's discriminatory policies and practices.  Throughout her employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of discrimination and discriminatory policies, Frazier was denied resources, support, and business opportunities and otherwise was treated worse than her colleagues who were not African American.  As one of only two African American FAs in her office of approximately 80 FAs, Frazier was isolated, ignored, and excluded from office and business activities.  Frazier was denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs.

46.     Throughout her tenure, Frazier was routinely excluded from business opportunities because of her race and sex.  She received no leads or referrals and was excluded from lucrative account transfers and distributions when FAs with substantial books of business retired or left the Firm, which happened dozens of times while Frazier worked in the Honolulu office.  FAs who were not African American were allowed to participate in account distributions and received substantial client accounts.  The largest and most lucrative client accounts were regularly steered to male FAs who were not African American.  Management provided false and pretextual reasons for transferring accounts exclusively to non-African American FAs.  For example, management claimed Frazier's ranking among the FAs in the office precluded her from receiving account distributions.  Frazier ultimately learned from the assistant to the Regional Manager that this was untrue, because Frazier's performance had consistently been ranked in the top tier of FAs.  When Frazier confronted her manager with this information, the manager responded that "what's done is done, we cannot change the past," or words to that effect.

47.     On many occasions, Frazier complained to management about her exclusion from

favorable account distributions.  Frazier asked to see reports documenting the account
distributions and ranking, but her requests were flatly rejected.  This was in violation of the *Jaffe
v. Morgan Stanley* and *Augst-Johnson v. Morgan Stanley* settlement agreements, which required
that account distribution reports be made available for review by FAs upon request.

48.     Like other African American FAs, Frazier was excluded from favorable pooling
and teaming opportunities, and her attempts to form a successful team were undermined by the
Firm.

49.     Due to her complaints of discrimination, Frazier suffered retaliation.  Morgan
Stanley conducted no investigation and took no corrective action.  Frazier was subjected to
increasing hostility by management and continued exclusion from any valuable leads, referrals,
and account distributions.  The Firm continued to block Frazier's efforts to team and allowed
male, non-African American FAs to poach client accounts from her book of business in violation
of Firm policy, which resulted in her losing assets and earnings.

50.     Despite the ongoing and escalating discrimination and retaliation, Frazier still
managed to perform well and generate significant revenues for Morgan Stanley.  Nevertheless, in
the face of management's increasing hostility and the ongoing attacks on her book of business
and livelihood, Frazier knew that the cumulative effect of the Firm's discrimination would erode
her future compensation and impair her ranking in progressively larger increments over time.
Furthermore, her manager asked Frazier when she was going to resign, which she took as a
threat.  As a result, Frazier had no choice but to leave Morgan Stanley in 2013.

51.     Frazier again tried to address the discrimination she had faced and complained to
the Diversity Monitor assigned by the Court under the *Jaffe* Settlement, Mr. Fred Alvarez.
Frazier does not believe any investigation was conducted, and she received no meaningful

response or relief from her efforts to seek assistance and reform.  Frazier also reached out to the

Diversity Monitor assigned pursuant to the *Augst-Johnson* settlement, who confirmed after an

investigation that Frazier had been wrongfully denied account distributions that had been

redirected to FAs who were male and not African American.  The monitor also confirmed that

Frazier had not received any credit for not receiving the account transfers to which she was

entitled.  Frazier is not aware of any corrective action that occurred as a result of this

investigation and finding.

**Yared Abraham**

52.     Plaintiff Yared Abraham worked as an FA in Morgan Stanley's branch office in

Honolulu, Hawaii from 2008 until he was constructively discharged in October 2013 because of

his race.

53.     Abraham was well qualified to succeed at Morgan Stanley.  When the Firm

recruited him from Merrill Lynch, Abraham already had over a decade of experience in the

financial services industry.  In addition to holding the requisite general licenses, he also held a

management-level industry license.

54.     Despite his outstanding credentials, Abraham, like other African American FAs,

was subjected to and harmed by Morgan Stanley's discriminatory policies and practices.

Throughout his employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of

discrimination and company-wide discriminatory policies, Abraham was denied resources and

business opportunities and treated worse than similarly situated employees who are not African

American.  As one of only two African American FAs in the office, Abraham was isolated,

ignored, and excluded from office and business activities.  Like other African American FAs,

Abraham was denied the mentoring, coaching, management and administrative support, financial

support for marketing efforts, and other support that was routinely given to non-African American FAs.

55.     Although many of the non-African American FAs in the Honolulu office were on teams, including teams designed for succession planning, Abraham was excluded from favorable teaming opportunities.  As a result, Abraham tried to form a team with a young Caucasian male trainee, whom he mentored and provided with client accounts and production.  This opportunity was not comparable to the other teams in the office, where seasoned FAs like Abraham were sharing their books of business, including those who were highly successful, and receiving greater accounts and opportunities from Morgan Stanley.  Nevertheless, Abraham was optimistic that, given time and guidance from Abraham, the trainee could develop into a successful partner. Abraham's managers undermined the relationship, however, before the trainee could mature into a productive team member.

56.     Like other African American FAs, Abraham was denied lucrative account transfers and distributions, which overwhelmingly were given instead to non-African American FAs.  This disparity unfairly pushed non-African Americans ahead of Abraham in the rankings, and as a result, Abraham received less compensation and fewer account distributions over time.

57.     Consistent with the Firm's culture, Abraham was viewed and treated differently because of his race.  A banker in the Honolulu office repeatedly and publicly called Abraham racially offensive names without repercussion.  The only other African American in the office was similarly mocked based on her race and racial stereotypes.

58.     Abraham was even excluded from diversity events.  Morgan Stanley regularly held national conferences for minority FAs, which were attended by numerous FAs from the Honolulu branch office, who were Asian.  Even though Abraham was one of only two African

American FAs in an office of approximately 80 FAs, he was never invited to attend one of the minority conferences.

59.     Abraham was denied management opportunities pursuant to the Firm's discriminatory management assignment practices.  Abraham was well-qualified and interested in joining management but Morgan Stanley elected to offer a management position to a white male trainee FA rather than to Abraham.  Indeed, Morgan Stanley unilaterally cancelled Abraham's Series 24 management license without his knowledge or consent.

60.     Frustrated by racial disparities in business opportunities and resources, hostility from co-workers and management, and lack of support, Abraham had no choice but to leave the Firm in October 2013.  Abraham lost substantial client accounts and his compensation further suffered as a result of false and misleading statements made to his clients by Morgan Stanley, including the false suggestion that Abraham had left the Firm because of financial misconduct relating to client accounts.

**O. Emmanuel Adepoju-Grace**

61.     Plaintiff Adepoju-Grace worked as an FA in Morgan Stanley's branch offices in Wilmington and Hockessin, Delaware from 2012 until he was terminated in September 2013 because of his race.

62.     Adepoju-Grace was well qualified to succeed at Morgan Stanley.  When he joined the Firm in 2012, Adepoju-Grace held a Bachelor's degree in Business Management from Westchester University, and he already had almost a decade of experience in the financial services industry.

63.     Despite his outstanding credentials, Adepoju-Grace, like other African American FAs, was subjected to and harmed by Morgan Stanley's discriminatory policies and practices.

Throughout his employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of discrimination and company-wide discriminatory policies, Adepoju-Grace was denied resources and business opportunities and treated worse than similarly situated employees who are not African American.  As one of only two African American FAs among approximately 45 FAs in the Wilmington office, Adepoju-Grace was isolated, ignored, and excluded from office and business activities.  Like other African American FAs, Adepoju-Grace was denied the mentoring, coaching, resources, and management, sales and administrative support routinely given to his non-African American colleagues.

64.     Many if not all of Adepoju-Grace's white peers in the Wilmington office were on teams, which enabled the white trainees to meet the performance goals of the training program. Adepoju-Grace was the only African American FA trainee, and he alone was excluded from opportunities to participate in teams or pools and to receive client accounts, production, resources and support from those teams.

65.     Like other African American FAs, Adepoju-Grace was excluded from lucrative account transfers and distributions, client leads, and referrals.  In contrast, his white peers were able to benefit from their teams' account transfers and distributions, thus increasing their compensation, advancing their rankings for future distributions, and enabling them to meet even higher performance goals.

66.     In addition to being excluded from teams and client account transfers, Adepoju-Grace was denied basic training and mentoring provided to his white colleagues, who were invited to participate in telephone calls between senior FAs and clients or prospective clients, among other things.

67.     Having denied Adepoju-Grace the same teaming and account distribution

opportunities and other support that enabled the white FA trainees to meet their performance goals, Morgan Stanley then terminated Adepoju-Grace's employment in September 2013, less than one year after he went into production.

**Andrew Clark**

68.     Plaintiff Andrew Clark worked as an FA in Morgan Stanley's I Street branch office in Washington, D.C. from 2013 until he was constructively discharged in May 2015 because of his race.

69.     Clark was well qualified to succeed at Morgan Stanley, having graduated from Howard University with a degree in Finance.  Despite his outstanding credentials, however, Clark, like other African American FAs, was subjected to and harmed by Morgan Stanley's discriminatory policies and practices.  Throughout his employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of discrimination and company-wide discriminatory policies, Clark was denied business opportunities and resources because of his race and was treated worse than similarly situated employees who are not African American.  As one of the only African Americans in the office, Clark was isolated, ignored, and excluded from office and business activities.  Like other African American FAs, Clark was denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs.

70.     For example, many of the non-African American FA trainees in Clark's office were teamed with senior FAs and given business opportunities and support to reach their training goals.  Clark actively sought out opportunities to partner or team with more senior FAs, but he, along with the only other African American FA trainee in the office, was excluded from such teaming opportunities.

71.     Like other African American FAs, Clark was also denied lucrative account transfers and distributions.  In contrast, Clark's non-African American peers received transfers that were much more valuable and which led to their achieving performance goals and receiving greater increases in compensation.

72.     Clark's inability to team and exclusion from account transfers, distributions, and other business opportunities and resources due to his race left Clark with no choice but to resign from Morgan Stanley in May 2015.

**Kwesi Coleman**

73.     Plaintiff Kwesi Coleman has worked for Morgan Stanley in Denver, Colorado since late 2012.

74.     When Morgan Stanley recruited Coleman from another financial services firm, Coleman was well qualified to succeed.  Coleman holds a Bachelor's degree in Mathematics from Montana State University, an MBA with a dual emphasis in Finance and Accounting, and a graduate degree from Regis University.  Coleman also had more than 10 years of experience in the financial services industry before joining Morgan Stanley.  In addition to the requisite FINRA brokerage licenses, Coleman held the designation of Certified Financial Planner ("CFP"), which requires CFP Board-approved education, a licensing exam, heightened ethical guidelines, and continuing education.  Coleman was one of only a few FAs in his region to hold the prestigious CFP designation.

75.     Despite his outstanding credentials and experience, like other African American FAs, Coleman has been subjected to and harmed by Morgan Stanley's discriminatory policies and practices.  Throughout his employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of discrimination and company-wide discriminatory policies, Coleman was

denied resources and business opportunities and treated worse than similarly situated employees who are not African American.  Like other African American FAs, Coleman was denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs.

76.     Consistent with the Firm's hiring patterns and corporate culture, Coleman has always been one of the very few African American FAs in his office and complex and has been isolated and excluded from networking, mentoring, and other opportunities helpful to building a book of business.

77.     Like other African American FAs, Coleman has been excluded from any opportunity to join a favorable team, pool, or partnership.  Morgan Stanley recruited and hired Coleman as a Wealth Advisory Associate with the promise that this financial planning role would give him access to senior, high-producing FAs and wealthy clients and would result in his joining a lucrative FA team.  Coleman excelled in his role, preparing hundreds of financial plans for clients of some of the most successful FAs in the complex and gaining recognition for his outstanding performance.  Coleman also actively sought out teaming opportunities and made presentations to white FAs about how he would add value for their clients and help increase the FAs' assets and production.  But despite Coleman's efforts and his outstanding credentials, no white FA would team with him.  The only pooling relationships available to Coleman were unfavorable, one-way relationships in which Coleman would be forced to share his commissions and client accounts with white FAs who would not reciprocate in any way.

78.     Many non-African American FAs in the Denver office have been permitted to and did join lucrative teams and pools.  As a result, these FAs received substantial transfers of assets and production credit, additional support, compensation, resources, and business opportunities.

Some of these teams were designed solely for succession planning, so that white FAs will inherit directly the books of business of retiring white FAs.

79.    Pursuant to Morgan Stanley's company-wide discriminatory policies, Coleman has also been denied lucrative account transfers and distributions, as well as leads, referrals, and other business opportunities.  Coleman's non-African American peers, many of whom are on favorable teams with senior FAs, have received account transfers that are much more valuable and which have led to greater increases in their compensation and books of business.

80.    Morgan Stanley also attempted to force Coleman to share his wealthy clientele with white FAs who had done nothing to obtain or maintain that business.  For example, Coleman developed a client relationship with a National Football League ("NFL") player who asked Coleman to become certified by the NFL Players' Association ("NFLPA") as a financial advisor to facilitate the client's referral of other NFL players to Coleman as clients.  After a lengthy vetting process, Coleman obtained the NFLPA certification and was allowed priority access to NFL players seeking investment advisors.  Although Morgan Stanley allowed other FAs to post their NFLPA status on their web pages, the Firm prohibited Coleman from doing so. When Coleman protested this discriminatory treatment, Morgan Stanley instructed Coleman that he could only market and use his NFLPA certification if he shared any resulting business and commissions with a white FA who lacks NFLPA certification.

81.    Coleman formally complained about his discriminatory treatment to his managers and the Firm's Human Resources department, to no avail.  The Firm took no meaningful corrective action.  On the contrary, Coleman's complaints have resulted in retaliation, ongoing discrimination, and an increasingly hostile work environment.  Morgan Stanley has continued to interfere with Coleman's business and to deny him support, resources, account transfers and

distributions, and business, teaming, and pooling opportunities.  It appears the Firm is attempting to force Coleman to leave his employment.

**Jeanna Pryor**

82.     Plaintiff Jeanna Pryor is an African American woman who worked for Morgan Stanley as an FA in the Washington, D.C. (I Street) and La Plata, Maryland branch offices from 2013 until she was constructively discharged in January 2016 because of her race.

83.     Pryor was well qualified to succeed at Morgan Stanley.  Before joining Morgan Stanley, Pryor obtained a Bachelor's degree in Personnel Management and three Master's degrees: Political Science and Public Management, Military Operational Art and Science Studies, and Military Strategic Studies.  Pryor also had retired from the United States Air Force as a full colonel after 36 years of dedicated military service.  For the last 26 years of her military service, Pryor directed schools sponsored by the Air Force and the Department of Defense that were responsible for instructing more than 30,000 students in financial and wealth management during her tenure.

84.     Despite her outstanding credentials and experience, Pryor was subjected to and harmed by Morgan Stanley's discriminatory policies and practices.  Throughout her employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of discrimination and company-wide discriminatory policies, Pryor was denied business opportunities, support, training, resources, and compensation because of her race and was treated worse than similarly situated employees who are not African American.  As one of the only African Americans in the I Street office and the only African American in the history of the La Plata office, Pryor was isolated, ignored, and excluded from office and business activities.  Like other African American FAs, Pryor was denied the mentoring, coaching, management and administrative support,

financial support for marketing efforts, and other support that was routinely given to non-African American FAs.

85.     Consistent with Morgan Stanley's systemic discrimination against African American FAs, Pryor was excluded from favorable teaming opportunities and account transfers and distributions.  Many non-African American FA trainees who began training around the same time in her region entered teaming relationships, which enhanced their compensation, business opportunities, training, and access to resources and enabled them to meet the training program's performance goals.

86.     Pursuant to Morgan Stanley's pattern or practice of discrimination, Pryor was denied training and support, including sales assistant support.  Non-African American FA trainees were able to use and receive help from sales assistants (called Client Service Associates or "CSAs"), including those of the more senior FAs with whom were partnered, thus freeing up time to focus on training, studying for exams, and prospecting for clients.  Pryor had no CSA support and was reprimanded when she sought assistance from CSAs in her office.

87.     Pryor was also denied lucrative account transfers, distributions, leads, and referrals.  On the one occasion when she received a favorable account distribution, it was part of a multi-client relationship.  Pryor was assigned the primary business account, but two white men were given the retirement accounts of the company's employees.  The white men improperly contacted Pryor's client and ultimately poached the account from her.  When Pryor complained, management agreed that the white FAs had behaved improperly, but the Firm did nothing to compensate Pryor for the loss of the account or to discipline the white FAs.

88.     Pryor requested and Morgan Stanley approved a transfer to the small La Plata, Maryland branch office, where the Firm's discrimination continued unabated.  Pryor was the first

African American FA in the La Plata office's 30-year history, and the white manager and white FAs made clear to Pryor that she was an unwelcome intruder who had been forced on them against their wishes.  Consistent with the Firm's stereotypical views and animus toward African Americans, Morgan Stanley ignored Pryor, falsely accused her of being dishonest and lazy, denied her resources, excluded her from teams and pools, and micromanaged her.

89.     When Morgan Stanley transferred Pryor to the La Plata office, the Firm erroneously transferred her client accounts to a different, non-African American FA.  As a result, Pryor had no access to her own clients for almost one month.

90.     When Pryor complained to her new manager about the poaching of her accounts, her manager refused to support Pryor and instead accused her of trying to steal clients from the white, male FAs who were just trying to feed their families, or words to that effect.  When Pryor complained to her manager about the Firm's discriminatory treatment and hostile work environment, the manager told her she was uninvited and unwanted, or words to that effect.

91.     Due to Morgan Stanley's hostile work environment and ongoing and escalating discrimination and retaliation, as well as the Firm's failure meaningfully to address Pryor's complaints of harassment and discrimination, Pryor had no choice but to leave the Firm in January 2016.

**Aisha Rada**

92.     Plaintiff Aisha Rada is an African American woman who worked as an FA in Morgan Stanley's branch office in Pittsburgh, Pennsylvania from October 2014 until her unlawful termination in November 2015.

93.     A graduate of Columbia University, Rada had worked for more than six years in the financial services industry before joining Morgan Stanley, including three years each at

HSBC Bank and the New York Mercantile Exchange.

94.     Rada was one of only two African American FAs in the Pittsburgh branch office, which had approximately 100 FAs at the time.  Despite her outstanding credentials and performance, Rada was subjected to and harmed by Morgan Stanley's discriminatory policies and practices.  Throughout her employment at Morgan Stanley, and pursuant to the Firm's pattern or practice of discrimination and company-wide discriminatory policies, Rada was denied resources and business opportunities and treated worse than similarly situated employees who are not African American.  As one of only two African American FAs in the office, Rada was isolated, ignored, and excluded from office and business activities.  Like other African American FAs, Rada was denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs.

95.     Among other things, Rada was excluded from favorable teaming and partnership opportunities.  Morgan Stanley was strongly promoting teaming at the Pittsburgh branch office, and most of the white trainees were on teams.  As a direct result of their team memberships, the white trainees in the office were able to meet their training goals.  Unfortunately, Rada and the other African American trainee in her office were excluded from such teaming opportunities.

96.     Rada actively sought out teaming opportunities, but she found only one senior FA – a white male – willing to enter into a "strategic partnership" with her.  The white FA made overtly sexual comments and overtures to Rada, and was unwilling to share his book of business with Rada as part of their "strategic partnership."  Instead, he proposed a one-way arrangement in which he would take 33% of all commissions that Rada earned on client accounts that she brought to the Firm.  He also expressed interest in using Rada to build his book of business by

attracting African American clients.  Rada complained about the lack of teaming opportunities and the harassment by the white FA.  Her manager took no action and refused to help her join a team.

97.     Rada was also denied lucrative account transfers and distributions when FAs with substantial books of business retired or left the Firm.  FAs who were not African American, including white trainees, were allowed to and did receive account distributions and substantial client accounts.  Like the teaming opportunities afforded white FAs, these account distributions enabled Rada's non-African American peers to achieve their performance goals, increase their compensation, and advance in the Power Rankings, which in turn enabled them to qualify for more and greater account distributions in the future.

98.     Rada was subjected to a hostile work environment based on her race and sex. Race-based comments were common in the office.  On several occasions, Complainant overheard FAs in the office speaking disparagingly about the only other African American professional, using racially-charged terms such as "lazy," even though he put in more time and effort than most trainees.  African American administrative staff and other office workers were identified by their race rather than name.  Management and most of the FAs excluded and ignored Rada, and one white FA asked Rada if she had just started at the Firm, even though she had been in the office for nearly a year by that time.  As described above, Rada was the target of sexual advances and comments by another FA in the office.  Morgan Stanley was aware of the FA's harassment of Complainant, but failed to investigate or take corrective action.  In addition, Rada's manager made sexist comments about her, telling a white male FA that he could use the manager's office to "get it out of [his] system," meaning to have relations with Rada.

99.     Rada's manager gave her the option to resign or be terminated, which would be

reflected on her U-5 and result in considerable harm to her career and reputation.  Due to the

Firm's discrimination, Rada left Morgan Stanley in November 2015.

**Plaintiffs Have Been Harmed By Morgan Stanley's Unlawful Conduct**

100.    Plaintiffs lost substantial clients and earnings due to Morgan Stanley's conduct

and their careers have been irreparably damaged.  Plaintiffs and other African American FAs lost

wages and other benefits, suffered emotional distress and other nonpecuniary losses, and their

careers were irreparably injured as a result of Morgan Stanley's conduct.  Morgan Stanley's

actions have caused and continue to cause Plaintiffs and the putative class members substantial

losses in earnings and other employment benefits, in an amount to be determined by a jury.

## CLASS ALLEGATIONS

101.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of a class of African Americans who worked for Morgan Stanley as FAs and

who were subjected to discrimination by Morgan Stanley due to their race.  All requirements of

class certification are met by the proposed class.

102.    The class of African American employees and former employees is so numerous

that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).

103.    There are questions of law and fact common to the class, and those questions can

and should be resolved in a single proceeding that furthers this litigation.  Fed. R. Civ. P.

23(a)(2).

104.    The claims alleged by Plaintiffs are typical of the claims of the class.  Fed. R. Civ.

P. 23(a)(3).

105.    Plaintiffs will fairly and adequately represent and protect the interests of the class.

Fed. R. Civ. P. 23(a)(4).

106.    The proposed class meets the requirements for certification under Rule 23(b)(2) and/or Rule 23(b)(3).  The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).

107.    The issues of determining liability and injunctive and equitable relief, among other issues, are also appropriate for issue certification under Rule 23(c)(4), as are other common issues.

## COUNT I

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. SECTION 1981

108.    Plaintiffs, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

109.    Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

110.    Morgan Stanley maintains a nationwide set of uniform, discriminatory employment practices and engaged in a pattern or practice of systemic race discrimination against African Americans that constitutes illegal intentional race discrimination in violation of 42 U.S.C. § 1981.

111.    Through the conduct alleged herein, Morgan Stanley denied Plaintiffs and other

African American FAs business opportunities (including but not limited to client accounts, leads, referrals, walk-ins, and call-ins); favorable teaming and pooling opportunities; resources valuable to their career and business; and sales, administrative and management support because of their race and based on racial stereotypes.  Defendant also discriminated against Plaintiffs and African Americans in compensation and in other terms and conditions of their employment.

112.    Plaintiffs and all those similarly situated were subjected to and harmed by Morgan Stanley's systemic and individual discrimination.

<u>**COUNT II**</u>

**RACE DISCRIMINATION IN VIOLATION OF
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
42 U.S.C. § 2000e-1 *et seq.***

113.    Plaintiffs Frazier and Clark, on behalf of themselves and those similarly situated, reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

114.    Plaintiffs Frazier and Clark each filed representative charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and have exhausted their administrative remedies and received Notices of Right To Sue from the EEOC.

115.    Title VII of the Civil Rights Act of 1964, and amendments thereto, make it an unlawful employment practice to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms or conditions, or privileges of employment, because of such individual's race, color or national origin; or to limit, segregate, or classify his or her employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, or

national origin.

116.    Title VII of the Civil Rights Act of 1964, as amended, also makes it unlawful for an employer to acquiesce with or perpetuate customer bias.

117.    Through the conduct alleged in this Third Amended Complaint, Defendant violated Title VII by subjecting Plaintiffs and African American FAs to unlawful employment practices and racial discrimination and by adopting and maintaining policies and practices that have a disparate impact against African Americans.

118.    Through the conduct alleged in this Third Amended Complaint, Defendant violated Title VII by subjecting Plaintiffs and African American FAs to conduct, policies, and practices that operated to limit, segregate, and classify Defendant's employees and applicants in ways that deprived them of employment opportunities and adversely affected their status as employees, because of their race and/or color.

119.    Through the conduct alleged herein, Morgan Stanley denied Plaintiffs and African American FAs business opportunities (including but not limited to client accounts, leads, referrals, walk-ins, and call-ins); favorable teaming and pooling opportunities; resources valuable to their career and business; and sales, administrative and management support because of their race and based on racial stereotypes.  Defendant also discriminated against Plaintiffs and African Americans in compensation and in other terms and conditions of their employment.

120.    Through its account distribution and cumulative advantage policies and practices, Morgan Stanley unlawfully accedes to customer bias.

121.    Plaintiffs and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination and violations of Title VII.

## COUNT III

### GENDER DISCRIMINATION IN VIOLATION OF
### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000e-1 *et seq.*

122.     Plaintiff Frazier realleges the above paragraphs and incorporate them by reference as though fully stated herein as part of Count III of this Complaint.

123.     Plaintiff Frazier filed a charge of discrimination with the EEOC and has received a Notice of Right To Sue from the EEOC.

124.     Title VII of the Civil Rights Act of 1964 and amendments thereto make it an unlawful employment practice to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his or her compensation, terms or conditions, or privileges of employment, because of such individual's gender; or to limit, segregate, or classify his or her employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee, because of such individual's gender.

125.     Through the conduct alleged herein, Morgan Stanley discriminated against Frazier because of her race and gender in her terms and conditions of employment.  Among other things, Morgan Stanley denied Frazier lucrative account distributions, resources, and other business opportunities and resources and instead directed those accounts, resources and business opportunities to male FAs in her branch office.  The Diversity Monitor for the *Augst-Johnson* gender discrimination lawsuit settlement investigated Frazier's complaints and confirmed that Frazier was entitled to account distributions that were instead received by male FAs.  The Monitor also confirmed that Frazier was denied any type of production credit for these losses.

126.     Morgan Stanley's conduct violated Title VII and harmed Frazier by resulting in

losses in production credits and compensation, among other losses.

## COUNT IV

### RETALIATION IN VIOLATION OF
### 42 U.S.C. § 1981

127.    Plaintiffs Frazier and Coleman reallege the above paragraphs and incorporate them by reference as though fully stated herein as part of Count IV of this Complaint.

128.    Plaintiffs Frazier and Coleman allege that they engaged in protected activity by complaining of their unlawful treatment.

129.    Plaintiffs Frazier and Coleman allege that they suffered retaliation and harm because of their protected activity, in violation of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find against Defendant as follows:

a.    Certify this case as a class action;

b.    Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.    Declare that Morgan Stanley's acts, conduct, policies, and practices are unlawful and violate 42 U.S.C. § 1981 and Title VII;

d.    Declare that Morgan Stanley engages in a pattern and practice of racial discrimination against African Americans and employs policies and practices that have an unlawful disparate impact on African Americans;

e.    Enjoin Morgan Stanley from implementing mandatory arbitration and class action waivers of civil rights and discrimination claims;

f.    Order Plaintiffs and all others similarly situated reinstated to their appropriate

positions, promotions, and seniority, and otherwise make Plaintiffs whole;

g.      Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Morgan Stanley's unlawful conduct;

h.      Award Plaintiffs and all others similarly situated compensatory and punitive damages;

i.      Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

j.      Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs;

k.      Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

By:     */s/ Linda D. Friedman*

Linda D. Friedman (*pro hac vice*)
Suzanne E. Bish (*pro hac vice*)
Shona B. Glink (# 4051280)
George S. Robot
STOWELL & FRIEDMAN LTD.
303 W. Madison, Suite 2600
Chicago, Illinois  60606
Phone: (312) 431-0888

## **CERTIFICATION OF SERVICE**

The undersigned counsel certifies that a copy of the foregoing was served upon all counsel of record via CM/ECF on May 6, 2016.

*/s/ Linda D. Friedman*