# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 16 Civ. 804 (RJS)

---

KATHY FRAZIER, *ET AL.*,

Plaintiffs,

VERSUS

MORGAN STANLEY, *ET AL.*,

Defendants.

---

MEMORANDUM AND ORDER
November 29, 2018

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/29/18

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiffs Kathy Frazier, Yared Abraham, O. Emmanuel Adepoju-Grace, Andrew Clark, Kwesi Coleman, Jeanna Pryor, and Aisha Rada (together, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against their employers, Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley (together, "Defendants" or "Morgan Stanley"), alleging employment discrimination in violation of 42 U.S.C. Section 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e-1, *et seq.* ("Title VII"). Now before the Court are Defendants' motions to (1) compel Coleman, Pryor, and Rada to individually arbitrate their claims and exclude them from participating in this case as class representatives, and (2) dismiss all the remaining Plaintiffs' claims – with the exception of the Section 1981 race discrimination claims brought by Plaintiffs Frazier, Abraham, Adepoju-Grace, and Clark – for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendants' motions are GRANTED with respect to Coleman, Pryor, and Rada, GRANTED with respect to Plaintiffs' pattern or practice, disparate impact, and individual discrimination claims, and DENIED as moot with respect to Plaintiffs' claims for class-wide injunctive relief. This action will

proceed as to the individual Section 1981 race discrimination claims brought by Plaintiffs Frazier, Abraham, Adepoju-Grace, and Clark, against which Defendants do not move.

## I. BACKGROUND

### A. Facts[1]

Morgan Stanley is a global financial services firm that employs over 16,000 "Financial Advisors" ("FAs") nationwide.[2] (TAC ¶ 7.) Generally speaking, FAs provide wealth management services to individual and institutional clients. As relevant here, FAs obtain clients in a number of ways, including through membership in a team or partnership of FAs, through the redistribution of accounts that occurs when an FA leaves the firm, and through Morgan Stanley's other distribution policies. (TAC ¶ 33.) Under Morgan Stanley's teaming and pooling policies, FAs are permitted to form teams with other FAs of their own choosing and combine their client accounts, subject to management approval. (*Id.* ¶ 36.) FAs also receive additional resources and business opportunities as a result of belonging to teams. (*Id.*) Morgan Stanley's redistribution policies further benefit those FAs who are members of teams by

distributing client accounts based on team membership. (*Id.* ¶ 37.) Team members also inherit accounts from Morgan Stanley employees on their teams who retire. (*Id.* ¶ 38.)

The Third Amended Complaint alleges that Morgan Stanley teams are "highly segregated by race, and African American FAs are almost entirely excluded from favorable teams and pools and the resources and opportunities they provide." (*Id.* ¶ 36.) This is in part because of "racial stereotypes and discrimination" that result in African American FAs not being "selected or permitted to join teams and pools as equal partners." (*Id.*) Each of the named Plaintiffs alleges that he or she suffered from the racially discriminatory effects of these policies as well as from intentional discriminatory treatment.

Plaintiff Kathy Frazier is an African American female who worked in Morgan Stanley's Honolulu, Hawaii office from 2007 until November 2013. (*Id.* ¶ 43.) Frazier alleges that she was excluded from business opportunities on the basis of her race and sex, that lucrative accounts were routinely "steered" to male, non-African American FAs, and that Morgan Stanley management provided false and pretextual reasons for accounts being assigned to non-African American FAs. (*Id.* ¶ 46.) At some point, Frazier was told that her low performance ranking precluded her from receiving account distributions, but she later learned that she was consistently ranked in the top tier of FAs. (*Id.*) Frazier complained about her exclusion from favorable account distributions and asked to see reports documenting the account distributions and her ranking, but her requests were denied. (*Id.* ¶ 47.) Frazier alleges that she was subjected to hostility and continued exclusion in retaliation for her complaints of discrimination, and that other

---

[1] The following facts are taken from the Third Amended Complaint ("TAC"). (Doc. No. 60.) The Court also considers the arguments raised in Defendants' memorandum of law in support of their motions (Doc. No. 78 ("Mem.")), Plaintiffs' opposition (Doc. No. 81 ("Opp'n")), and Defendants' reply (Doc. No. 82 ("Reply")), as well as the accompanying declarations and exhibits.

[2] The Third Amended Complaint refers to a number of job titles under the umbrella of FA, including "tenured FAs as well as FA trainees, . . . Financial Advisor Associates, Registered Financial Advisor Trainees, Wealth Advisory Associates, Private Banking Advisory Associates, and Resident Financial Advisors," as well as "'producing' managers." (TAC ¶ 1 n.1.)

FAs "poached" clients from her book of business in violation of Morgan Stanley policy. (*Id.* ¶ 49.) Frazier alleges that she had no choice but to resign in November of 2013. (*Id.* ¶ 50.)

Plaintiff Yared Abraham is an African American male who also worked in the Honolulu, Hawaii office from 2008 until October 2013. (*Id.* ¶ 52.) Abraham alleges that he was excluded from teaming opportunities, and that when he tried to form a team with a white man whom he mentored, his managers undermined the relationship. (*Id.* ¶ 55.) Abraham alleges that a banker in his office referred to him using racially offensive names, that he was excluded from diversity events, and that although he was well-qualified to assume a management position, he was passed over in favor of another white male FA. (*Id.* ¶¶ 57–59.)

Plaintiff O. Emmanuel Adepoju-Grace is an African American male who worked in Morgan Stanley's Delaware offices from 2012 until September 2013. (*Id.* ¶ 61.) Adepoju-Grace alleges that he was excluded from account distributions and teaming opportunities, and was denied basic training and mentoring that his white colleagues received before he was terminated in 2013. (*Id.* ¶¶ 65–66.)

Plaintiff Andrew Clark is an African American male who started working in Morgan Stanley's Washington, D.C. office in 2013. (*Id.* ¶ 68.) Clark alleges that he was denied account transfers and distributions, even after he sought out opportunities to team with more senior FAs. (*Id.* ¶¶ 70–71.) Clark alleges that he was left with no choice but to resign from Morgan Stanley in May 2015. (*Id.* ¶ 72.)

Plaintiff Kwesi Coleman is an African American male who has worked in Morgan Stanley's Denver, Colorado office since late

2012. (*Id.* ¶ 73.) He alleges that, despite actively seeking out teaming opportunities, no white FAs would team with him and that the only pooling relationships available to him were "unfavorable, one-way relationships" that required Coleman to share his commissions and accounts without reciprocation. (*Id.* ¶ 77.) Coleman also alleges that Morgan Stanley prohibited him from posting his National Football League Players' Association financial advisor certification on Morgan Stanley's website, even though Morgan Stanley allowed other FAs to post the same certification, and later conditioned his posting of the certification on a promise to share any resulting business with a white FA who lacked the certification. (*Id.* ¶ 80.)

Plaintiff Jeanna Pryor is an African American female who worked in the firm's Washington, D.C. and La Plata, Maryland offices from 2013 until January 2016. (*Id.* ¶ 82.) Pryor alleges that she was excluded not only from teaming opportunities and account transfers, but also from the use of sales assistants called Client Service Associates. (*Id.* ¶¶ 85–86.) Pryor also alleges that two white FAs poached an account from her, and that when she complained, Morgan Stanley did nothing about it. (*Id.* ¶ 87.) At some point, Pryor requested, and Morgan Stanley approved, a transfer from the Washington, D.C. office to the La Plata office, where she alleges that the discrimination continued and she was falsely accused of being dishonest and lazy based on stereotypes and discriminatory views towards African Americans. (*Id.* ¶ 88.) Pryor further alleges that, when she was transferred, her client accounts were erroneously transferred to another, non-African American FA for "almost one month." (*Id.* ¶ 89.)

Plaintiff Aisha Rada is an African American female who worked in Morgan

3

Stanley's Pittsburgh, Pennsylvania office from October 2014 until November 2015. (*Id.* ¶ 92.) Despite seeking out teaming opportunities, Rada was only able to team with one senior FA, a white male who made overtly sexual comments to Rada, was unwilling to share his book of business, and proposed a one-way partnership whereby he would take 33% of her commissions. (*Id.* ¶ 96.) Rada also heard other FAs make sexist and disparaging remarks about her, including that she was lazy. (*Id.* ¶ 98.) Rada alleges that at some point, her manager told another FA that he could use the manager's office to have a sexual relationship with Rada. (*Id.*) Rada was given the option to resign or be terminated, and she chose to resign in November 2015. (*Id.* ¶ 99.)

## B. Procedural History

Frazier commenced this action by filing a class action complaint on September 30, 2015 in the Northern District of California. (Doc. No. 1.) Frazier filed an amended complaint on October 2, 2015. (Doc. No. 4.) On October 30, 2015, Frazier filed a motion asking Judge Thelton E. Henderson to consider this case as related to *Jaffe v. Morgan Stanley & Co.* – a 2006 class action filed in the Northern District of California involving similar allegations that resulted in a settlement and consent decree in 2008, including significant injunctive relief. N.D. Cal. Case No. 3:06-cv-3903 (TEH), Doc. No. 249 (N.D. Cal. 2008). Judge Henderson denied that request on November 5, 2015 (Doc. No. 14), and on November 16, 2015, Frazier filed a motion to transfer this case to the Southern District of New York, which was granted on January 29, 2016 (Doc. Nos. 18, 33). In the meantime, Frazier filed a second amended complaint on December 23, 2015. (Doc. No. 28.) The case was assigned to my docket on February 8, 2016.

On February 22, 2016 and February 29, 2016, consistent with the Court's Individual Rules and Practices, the parties submitted pre-motion letters regarding Defendants' contemplated motion to dismiss and to strike portions of the second amended complaint. (Doc. Nos. 45, 48.)

After a pre-motion conference to discuss Defendants' contemplated motions (*see* Doc. No. 58), Plaintiffs filed the Third Amended Complaint, which added all of the named Plaintiffs in this action other than Frazier, on May 6, 2016 (Doc. No. 60). The Third Amended Complaint raises four counts. Count I, which concerns all Plaintiffs and is also brought on behalf of a putative class, alleges that Defendants discriminated on the basis of race in violation of 42 U.S.C. § 1981. (TAC ¶¶ 108–12.) Count II, which relates to Plaintiffs Frazier and Clark and is again brought on behalf of a putative class, alleges that Defendants violated Title VII by discriminating on the basis of race. (*Id.* ¶¶ 113–21.) Count III, which aims to redress injuries suffered by Plaintiff Frazier, alleges that Defendants engaged in gender discrimination that violated Title VII. (*Id.* ¶¶ 122–26.) Finally, Count IV, which concerns Plaintiffs Frazier and Coleman, alleges that Defendants engaged in improper retaliation in violation of 42 U.S.C. § 1981. (*Id.* ¶¶ 127–29.)

Defendants filed the instant motion on June 20, 2016. (Doc. No. 65.) Specifically, Defendants seek to compel arbitration of Coleman, Pryor, and Rada's individual claims (and to prevent them from acting as class representatives), dismiss Plaintiffs' class claims, and dismiss many of Plaintiffs' individual claims.[3] (*See* Mem. at 13–25.)

---

[3] Specifically, Defendants move to dismiss Frazier's Title VII claims and Section 1981 retaliation theory and Clark's Title VII Claims. Defendants do not seek to dismiss the Section 1981 race discrimination

On August 30, 2016, Plaintiffs filed a letter motion to stay this case pending the Second Circuit's consideration of *Patterson v. Raymours Furniture Co.*, No. 15-2820 (Doc. No. 71), which Defendants did not oppose (*see* Doc. No. 72). Accordingly, on September 2, 2016, the Court granted the motion to stay and dismissed Defendants' motion without prejudice to renewal within thirty days of the Second Circuit's decision in *Patterson*. (Doc. No. 73.) That same day, the Second Circuit issued a summary order affirming the district court's judgment, and the *Patterson* plaintiffs filed a petition to the Supreme Court for a writ of *certiorari*. (*See* Doc. No. 74.) Plaintiffs requested that the stay be continued pending the *Patterson* plaintiffs' petition for *certiorari*, which the Court denied.[4] (Doc. No. 76.) Defendants then renewed their motion, which was fully briefed on December 5, 2016. (Doc. No. 82.) After the motion was briefed, the parties exchanged several rounds of letter briefs regarding supplemental authority; the last filing, a letter from Plaintiffs, was submitted on October 25, 2018. (Doc. Nos. 90–103.)

## II. DEFENDANTS' MOTION TO COMPEL ARBITRATION OF THE CLAIMS OF COLEMAN, PRYOR, AND RADA

Coleman, Pryor, and Rada all signed employment agreements with Morgan Stanley that contained arbitration provisions. Coleman and Pryor's employment agreements, which they signed on December 13, 2012 and July 15, 2013, respectively, contained the following language concerning arbitration:

8.1 Any controversy or claim arising out of or relating to (i) your employment by [Defendants] (excluding statutory employment claims and other claims covered by Paragraph [8.2] below), or (ii) this Agreement and any Addendum (or its breach), will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with its rules . . . . Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision [is] to be resolved in arbitration. . . .

8.2 Notwithstanding the arbitration requirements of paragraph [8.1] above, you agree that certain other claims (including, but not limited to, statutory discrimination and other statutory employment claims) may be submitted to the Firm's Alternative Dispute Resolution Program, "Convenient Access to Resolution for Employees" ("CARE"), or to the applicable administrative agency or court of law.

(Doc. No. 81-1 at 18, 30–31.) Rada's employment agreement, which she signed on June 4, 2014, contained a different arbitration clause, which provided:

8.1 You agree to arbitrate any dispute, claim or controversy that may arise between you and Morgan Stanley or any person that is required to be arbitrated: (i) under the rules, constitutions, or by-laws (as may be amended from time-to-time) of any self-regulatory organization with which you are or may become registered, including, but not limited to, the Financial Industry Regulatory

---

claims brought by Frazier, Abraham, Adepojou-Grace, and Clark.

[4] The *Patterson* petition for *certiorari* was dismissed on May 9, 2018. *See Patterson v. Raymours Furniture Co., Inc.* 138 S. Ct. 1975, 1975 (2018) (Mem.).

Authority ("FINRA"), or (ii) pursuant to any arbitration agreement to which you are a party. . . . Except as otherwise expressly agreed, any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision must be resolved in arbitration.

(*Id.* at 42–43.) All three employees' contracts contained a clause stating that "[t]his writing constitutes the entire agreement of the parties with respect to the subject matter recited in this Agreement. This agreement may be amended only by a writing signed" by both parties. (*Id.* at 19, 31, 43.) All three contracts also contained a choice of law provision stipulating that they will be "governed, construed and enforced" under New York law. (*Id.* at 19, 31, 43.)

Beginning in May 2015, Morgan Stanley introduced an expansion of its CARE Arbitration Program that purported to make arbitration mandatory for all covered claims. (*See* Doc. No. 80 ¶ 4.) According to a declaration from Jessica Krentzman, the Regional Head of Employee Relations in Morgan Stanley's Human Resources Department, information about the expanded program was "sent in waves," and a summary of the new CARE Arbitration Program, links to an updated CARE Guidebook, and a sample arbitration agreement were maintained on the firm's intranet human resources site for employees to review. (*Id.*) On September 2, 2015, Morgan Stanley sent an email to Coleman, Pryor, and Rada, with the subject line "Expansion of CARE Arbitration Program," which provided that:

[e]ffective October 2, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the Firm and employees will be

resolved through final and binding arbitration on a non-class, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook.

(*Id.* ¶ 6; Doc Nos. 80-2, 80-3, & 80-4.) Links to an arbitration agreement (the "Arbitration Agreement") and the CARE Guidebook were also provided in the body of the email. The email explained that, by continuing their employment at Morgan Stanley, Coleman, Pryor, and Rada accepted and agreed to be bound by the terms of the Arbitration Agreement unless, by October 2, 2015, they completed, signed, and submitted an opt-out form, a link to which was provided in the email. (Doc. No. 80 ¶ 6.)

Paragraph 1 of the Arbitration Agreement stated that the parties "agree that any Covered Claims . . . will be resolved by final and binding arbitration" as set forth in the Arbitration Agreement and in the CARE Guidebook, that the Arbitration Agreement "makes arbitration the required and exclusive forum for the resolution of all Covered Claims," and that "you and Morgan Stanley are giving up your and its right to a jury trial in any forum." (Doc. No. 80-5 ¶ 1.) Paragraph 4 of the Arbitration Agreement states, in bold, capitalized letters,

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION . . . BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT YOU ARE NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR

REPRESENTATIVE        ACTION
MEMBER . . . .

(*Id.* ¶ 4.)

In deciding whether claims are subject to arbitration, courts consider "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). Before addressing the second inquiry, a court must first determine whether the court or the arbitrator properly decides the issue. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011). Questions of arbitrability, such as whether the parties are bound by an arbitration clause or whether the clause applies to a particular type of controversy, are for a court to decide unless the parties clearly and unmistakably provide otherwise. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–84 (2002). By contrast, "gateway questions," such as time limits, notice, and other procedural issues "which grow out of the dispute and bear on its final disposition," are presumptively for an arbitrator to decide. *Id.* When deciding a motion to compel arbitration, the Court may consider extrinsic evidence bearing on whether the parties agreed to arbitrate. *See Euro Pac. Capital Inc. v. Bohai Pharm. Grp., Inc.*, No. 15-cv-4410 (VM), 2016 WL 297311, at *3 (S.D.N.Y. Jan. 21, 2016); *see also Sutherland v. Ernst & Young LLP*, 768 F. Supp. 2d 547, 548 n.1 (S.D.N.Y. 2011) (in deciding a motion to compel arbitration, "the Court considers, as it must, the extrinsic evidence submitted by the parties"), *rev'd and remanded on other grounds*, 726 F.3d 290 (2d Cir. 2013).

A party seeking to enforce a collective action waiver and compel arbitration must establish the existence of an agreement to arbitrate under ordinary principles of contract law. *See, e.g.*, *Ross v. Am. Express Co.*, 478 F.3d 96, 99 (2d Cir. 2007) (citing *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)). Whether the parties agreed to arbitrate a certain matter is governed by state-law principles regarding contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 48 (2d Cir. 2000). "It is 'well settled' under New York law that arbitration will not be compelled absent the parties' 'clear, explicit and unequivocal agreement to arbitrate.'"[5] *Manigault v. Macy's East, LLC*, 318 F. App'x. 6, 7–8 (2d Cir. 2009) (quoting *Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144, (2008)).

Neither party disputes that Plaintiffs' claims are "Covered Claims" under the Arbitration Agreement. Instead, Plaintiffs make several arguments contesting the validity and enforceability of the Arbitration Agreement. First, Plaintiffs argue that the

---

[5] Plaintiffs conclusorily state that "the law of Pennsylvania, Maryland, Colorado, and D.C., where Plaintiffs worked" governs whether Plaintiffs agreed to arbitrate. (Opp'n at 11.) However, Plaintiffs do not rebut Defendants' argument that New York has a materially greater interest in connection with this litigation because the employment agreements contained a choice of law provision selecting New York law, Morgan Stanley maintains its headquarters and principal place of business in New York, and the litigation forum is in New York. (*See* Mem. at 10 n.9.) Furthermore, in her motion to transfer this case, Plaintiff Frazier argued that the focus of this action will be the conduct of Defendants, that "Morgan Stanley and the key executives involved in designing and implementing the challenged employment policies" are located in New York, and that "the Southern District of New York has a far more significant connection to the litigation" than the Northern District of California. (Doc. No. 18 at 3, 4.) Accordingly, the Court finds that New York law governs the issue of whether Plaintiffs agreed to arbitrate their claims.

entire putative class in this case opted out of the Arbitration Agreement either (1) when class counsel in this case submitted an opt-out form for Frazier and the putative class on October 1, 2015, or (2) when class counsel in two separate 2006 lawsuits submitted the opt-out forms on behalf of the certified classes in those lawsuits on October 2, 2017. Second, Plaintiffs argue that the September 2, 2015 email to Coleman, Pryor, and Rada failed to provide adequate notice of the Arbitration Agreement and that their continued employment at Morgan Stanley did not manifest their assent to its terms. Third, Plaintiffs argue that, because Coleman, Pryor, and Rada's employment agreements "may be amended only by a writing signed by both" parties, the Arbitration Agreement cannot bind them because it was not signed. (Doc. No. 81-1 at 19, 31, & 43.) Finally, Plaintiffs argue that Coleman, Pryor, and Rada's employment agreements preserved their rights to bring certain employment discrimination claims in court. The Court will address each of these arguments in turn.

## A.  Coleman, Pryor, and Rada Did Not Opt Out of the Arbitration Agreement

Plaintiffs cite no authority for the proposition that class counsel – as opposed to the employees themselves – may opt out of contractual provisions on behalf of either a certified or putative class. More importantly, none of the supposed class-wide opt-outs complied with the terms of the Arbitration Agreement's opt-out provision, which provides that "Your CARE Arbitration Program Opt-Out Form must be received and acknowledged by return email to be effective." (Doc. No. 80-7.) Certainly, Plaintiffs do not allege that Coleman, Pryor, or Rada either sent an opt-out or received a return email acknowledging their opt-out. For their part, Defendants here submitted a declaration

indicating that no acknowledgement email was ever sent to any of these three Plaintiffs. (Doc. No. 80 ¶ 17.) Accordingly, Plaintiffs' argument that Coleman, Pryor, and Rada opted out of the Arbitration Agreement is without merit.

## B.  Coleman, Pryor, and Rada Had Adequate Notice of and Assented to the Terms of the Arbitration Agreement

With regard to Plaintiffs' argument that the September 2, 2015 email failed to provide adequate notice and that continued employment at Morgan Stanley did not manifest assent to the terms of the Arbitration Agreement, the law is clear that "[a] non-signatory to an arbitration agreement may be bound by the principle of assumption." *Gonzalez v. Toscorp Inc.*, No. 97-cv-8158 (LAP), 1999 WL 595632, at *2 (S.D.N.Y. Aug. 5, 1999). Assumption arises when a party's "subsequent conduct indicates that it is assuming the obligation to arbitrate," and an employee may assume an obligation to arbitrate future employment claims if he or she continues to work after receipt of an arbitration policy. *Id.* (quoting *Thomson-CSF*, 64 F.3d at 777). In *Gonzalez*, the court found that the plaintiff had assumed the obligation to arbitrate, despite the fact that he did not sign acknowledgments of receipt that accompanied an updated arbitration policy that was physically distributed to employees, because he "conceded receipt of the Policy and the Handbook and chose to continue his employment." *Id.* Courts routinely apply the principle of assumption to bind employees who manifest their assent to an arbitration policy by continuing to work for their employer. *See, e.g.*, *Manigault*, 318 F. App'x at 8 (holding that employee was bound by arbitration agreement when she failed to rebut presumption that she had received a mailing containing notice of arbitration agreement and continued with

her employment); *Clearfield v. HCL Am. Inc.*, No. 17-cv-1933 (JMF), 2017 WL 2600116, at *2 (S.D.N.Y. June 15, 2017) (same, when arbitration agreement was emailed with opt-out instructions and employee continued working); *Couch v. AT & T Servs., Inc.*, No. 13-cv-2004 (DRH) (GRB), 2014 WL 7424093, at *5 (E.D.N.Y. Dec. 31, 2014) (same, when the defendant offered evidence that the employee received three emails notifying him about the arbitration program and the "need to opt out" and the employee failed to do so).

Neither Coleman nor Pryor nor Rada contend that they did not receive the email about the expanded arbitration program, that they personally opted out of the Arbitration Agreement or the expanded CARE Arbitration Program, or that they did not continue working at Morgan Stanley after October 2, 2015. And while each now contends that he or she does not recall reading the email (Doc. Nos. 81-2 ¶ 9; 81-3 ¶ 9; 81-4 ¶ 8), none goes so far as to say that they did not receive the email or were not on notice of the Arbitration Agreement. By contrast, Defendants have submitted declarations attaching copies of the September 2, 2015 emails that were sent to Coleman, Pryor, and Rada (Doc. Nos. 80-2, 80-3, & 80-4), and indicating that none of those Plaintiffs sent an email to the address provided for questions relating to the Arbitration Agreement or CARE Program (Doc. No. 80 ¶ 17). Furthermore, according to a second declaration from Krentzman, 3,974 out of 14,298 Morgan Stanley employees, or approximately 27.8%, *did* opt out of the CARE Arbitration program, further underscoring the sufficiency of Morgan Stanley's notice. (Doc. No. 83 ¶ 3.) Indeed, since Defendants' motion was briefed, five courts, including three in the Southern District of New York, have rejected arguments nearly identical to those raised by Plaintiffs and granted motions to

compel arbitration pursuant to the very same arbitration agreement distributed in the very same way as the one at issue in this case. *See Schmell v. Morgan Stanley & Co., Inc.*, No. 17-13080, 2018 WL 4961469, at *2 (D.N.J. Oct. 15, 2018); *Lockette v. Morgan Stanley*, No. 18-cv-876 (JGK), 2018 WL 4778920 (S.D.N.Y. Oct. 3, 2018); *Pelligrino v. Morgan Stanley Smith Barney*, No. 17-cv-7865 (RA), 2018 WL 2452768 (S.D.N.Y. May 31, 2018); *Grant v. Morgan Stanley Smith Barney LLC*, No. 16-81924-CIV, 2017 WL 1044484, at *4 (S.D. Fla. Mar. 20, 2017); *Zengotita v. Morgan Stanley & Co. LLC*, No. 17-cv-897 (LGS) (S.D.N.Y. Apr. 13, 2017) (Doc. No. 25).[6] Accordingly, Plaintiffs' arguments premised on lack of notice and assent also fail.

### C. An Arbitrator Must Decide Whether the Arbitration Agreement Amended Coleman and Pryor's Employment Agreements

Plaintiffs next argue that the Arbitration Agreement, which was never signed, constitutes an amendment to Coleman and Pryor's employment agreements, and is therefore ineffectual because those agreements require any amendment to be in writing and signed by both parties. (Doc. No. 81-1 at 19, 31.) The Court is skeptical of this argument given the fact that the employment agreements, which state that

---

[6] Plaintiffs' argument that the arbitration provisions are unenforceable because Defendants did not inform FAs "of the existence of this class action litigation or of their right to join this action" is deeply flawed. (Opp'n at 11 (quoting *Weinstein v. Jenny Craig Ops., Inc.*, 17 N.Y.S.3d 407, 408 (N.Y. App. Div. 2015).) The case cited by Plaintiffs is easily distinguishable and limited only to employees *hired after* the relevant litigation had commenced. *Weinstein*, 17 N.Y.S.3d at 408. This action was not filed in California until September 30, 2015, months after the expanded CARE program was announced and weeks after the September 2, 2015 emails containing the terms of the Arbitration Agreement were sent to Coleman, Pryor, and Rada.

certain claims "may be submitted" to alternative dispute resolution (*see* Doc. No. 81-1 at 18, 30–31), likely do not preserve a unilateral right to go to court, *Benihana of Tokyo, LLC v. Benihana Inc.*, 73 F. Supp. 3d 238, 249 (S.D.N.Y. 2014) (holding that use of the permissive "may" in arbitration clause does not obligate both parties to initiate disputes in arbitration, but once a party does elect to arbitrate, the other may not "neutralize that choice by insisting on litigating in court"). However, the Court need not pass on this question because this issue is properly decided by the arbitrator.

"'[A]rbitrability' is a term of art covering 'dispute[s] about whether the parties are bound by a given arbitration clause' [i.e., formation] as well as 'disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy' [i.e., scope]." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Republic of Ecuador*, 638 F.3d at 393). When "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).

Coleman and Pryor's employment agreements contain clauses indicating that they agreed to arbitrate any "controversy or claim arising out of or relating to . . . [the employment agreement] and any Addendum or its breach." (Doc. No. 81-1 at 42–43.) The employment agreement also provides that "any dispute as to the arbitrability of a particular issue or claim pursuant to this arbitration provision [is] to be resolved in arbitration." *Id.* Additionally, the Arbitration Agreement explicitly states that "[a]ny issue concerning arbitrability of a

particular issue or claim pursuant to this Arbitration Agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court." (Doc. No. 905-5 ¶ 4.) Pursuant to the Arbitration Agreement, arbitration may be conducted under FINRA or JAMS rules, both of which empower an arbitrator to decide issues of arbitrability. Specifically, FINRA Rule 13413 provides that "[t]he panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the parties." The JAMS Employment Arbitration Rules similarly provide that

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Employment Arbitration Rules & Procedures, Rule 11(c). The Second Circuit has held that each of these rules evidences a party's intent to arbitrate the question of arbitrability. *See All. Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 127 (2d Cir. 2006) (FINRA); *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 6 (2d Cir. 2013) (summary order) (JAMS).

Both the employment agreements and the Arbitration Agreement therefore clearly provide for the arbitration of questions concerning the arbitrability of any dispute

arising out of or relating to those agreements. The parties' dispute as to whether the Arbitration Agreement constitutes an "amendment" to Coleman and Pryor's employment agreements is obviously a "controversy or claim arising out of or relating to" the employment agreements, and is subject to mandatory arbitration under Coleman and Pryor's employment agreements, as is any controversy regarding the arbitrability of that dispute. (Doc. No. 81-1 at 42–43.) Accordingly, that issue must be arbitrated pursuant to Coleman and Pryor's employment agreements.

### D. Rada Must Arbitrate Her Employment Claim Pursuant to the Arbitration Agreement

Unlike Coleman and Pryor's employment agreements, Rada's employment agreement is not limited to the arbitration of disputes "arising out of or relating to" her employment agreement. Also unlike Coleman and Pryor's employment agreements – which contain a clause stating that certain claims, including statutory discrimination and other statutory employment claims, "may be submitted" to CARE "or to the applicable administrative agency or court of law" – Rada's employment agreement does not mention submitting claims to a "court of law." (*Compare* Doc. No. 81-1 at 18, 30 *with* Doc. No. 81-1 at 42–43.) Instead, Rada's employment agreement unambiguously requires her to arbitrate any claim or controversy between her and Morgan Stanley "pursuant to any arbitration agreement to which you are a party." (Doc. No. 81-1 at 42–43.) Accordingly, Plaintiffs' argument that Rada's employment agreement preserved her right to sue in court is wholly without merit. As set forth above, Rada is lawfully bound by the Arbitration Agreement, and must therefore arbitrate her statutory employment claim pursuant to that agreement.

### E. Coleman, Pryor, and Rada Must Arbitrate Individually

For the reasons stated above, Coleman, Pryor, and Rada are bound by the terms of the Arbitration Agreement, and must arbitrate their disputes. Additionally, the Arbitration Agreement provides that "no covered claims may be initiated, maintained, heard or determined on a class action . . . basis either in court or in arbitration, and that [Coleman, Pryor, and Rada] are not entitled to serve or participate as a class, collective, or representative action member." (Doc. No. 80-5 ¶ 4.) The Supreme Court's recent decision in *Epic Systems Corp. v. Lewis* confirms that such class-arbitration waivers are enforceable. *See* 138 S. Ct. 1612, 1619 (2018). Accordingly, there can be no doubt that Coleman, Pryor, and Rada must arbitrate their claims on an individual and not a class action basis.

### III. THE REMAINING PLAINTIFFS' DISCRIMINATION CLAIMS

The remaining Plaintiffs – Frazier, Abraham, Adepoju-Grace, and Clark – are not subject to arbitration clauses and may therefore pursue their claims in federal court. However, Defendants contend that these Plaintiffs' class claims, and some of their individual claims, must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet

11

this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

The remaining Plaintiffs' claims arise under two federal statutes – Section 1981 and Title VII.

First, Plaintiffs argue that Defendants discriminated against each of the named Plaintiffs, and against similarly-situated Morgan Stanley employees as a class, on the basis of race in violation of Section 1981. To state an individual claim under Section 1981, each Plaintiff must allege (1) that he or she is a member of a racial minority, (2) "an intent to discriminate on the basis of race by the defendant," and (3) that the Plaintiff suffered discrimination that relates to "one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 338 (S.D.N.Y. 1999) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). A

plaintiff may prove a Section 1981 claim on a class-wide basis by establishing that a defendant engaged in a "pattern or practice" of discriminatory conduct. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875 (1984). Under a pattern or practice theory, "isolated or sporadic discriminatory acts by the employer [are] insufficient," *id.* at 875–76; rather, the plaintiff must show that "discrimination was the company's standard operating procedure," that is, the "regular rather than the unusual practice," *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

Next, Plaintiffs contend that Defendants discriminated against Plaintiffs Frazier and Clark, and against all similarly-situated Morgan Stanley employees, on the basis of race in violation of Title VII, and against Frazier and all similarly-situated employees on the basis of sex in violation of the same statute. Generally, to state an individual claim under Title VII, "a plaintiff must plausibly allege that (1) the employer took an adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). To state an individual claim under a disparate treatment theory, a plaintiff must plead "membership with a protected group," "satisfactory performance" of duties by the employee, "an adverse employment action," and "circumstances surrounding the action that give rise to an inference of unlawful discrimination." *Hagan v. City of New York*, 39 F. Supp. 3d 481, 495 (S.D.N.Y. 2014)

(quoting *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). "To establish a prima facie case of disparate impact, a plaintiff must '(1) identify a [facially neutral] policy or practice; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Id.* (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001)).

Moreover, as noted above, Plaintiffs hope to establish both disparate treatment liability and disparate impact liability on a class-wide basis. For their disparate treatment claim, Plaintiffs rely – as they do in the Section 1981 context – on a pattern or practice theory. As with a Section 1981 claim, a Title VII pattern or practice claim requires the plaintiff to show that "intentional discrimination was the defendant's 'standard operating procedure.'" *Robinson*, 267 F.3d at 158 (quoting *Teamsters*, 431 U.S. at 336); *see also E.E.O.C. v. Mavis Discount Tire, Inc.*, 129 F. Supp. 3d 90, 102 (S.D.N.Y. 2015). However, a disparate impact claim requires no such proof of discriminatory intent. Instead, "disparate impact claims are concerned with whether employment practices or policies that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group." *Robinson*, 267 F.3d at 160. Accordingly, to properly state a claim for Title VII disparate impact discrimination, a plaintiff need not allege discriminatory intent.

As noted in footnote 3, Defendants do not seek dismissal of the individual Section 1981 race discrimination claims brought by Plaintiffs Frazier, Abraham, Adepoju-Grace, and Clark. (Mem. at 1.) Instead, Defendants attack Plaintiffs' class claims, the individual Title VII discrimination claims brought by Frazier and Clark, and Frazier's Section 1981 retaliation theory.

The Court will address the viability of Plaintiffs' class-wide theories before turning to the individual claims that Defendants attack.

### A. Plaintiffs' Class Claims

### 1. Plaintiffs' Pattern or Practice Claims

At the pleading stage, a plaintiff alleging employment discrimination need not plead a prima facie case of discrimination; instead, he "'need only give plausible support to a minimal inference of discriminatory motivation.'" *Vega*, 801 F.3d at 84 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)). The plaintiff's initial burden in a class-wide pattern or practice case "is heavier in one respect and lighter in another respect than the burden in an individual case." *United States v. City of New York*, 717 F.3d 72, 84 (2d Cir. 2013). On one hand, the burden is heavier because the plaintiff must make "a showing of a pervasive policy of intentional discrimination," rather than demonstrating "a single instance of discriminatory treatment." *Id.*; *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 878 (1984) ("[A] class plaintiff's attempt to prove the existence of a companywide policy, or even a consistent practice within a given department, may fail even though discrimination against one or two individuals has been proved."). On the other hand, the burden in a pattern or practice claim is lighter "in that the plaintiff need not initially show discrimination against any particular present or prospective employee" – although "instances of discrimination against particular employees are relevant to show a policy of intentional discrimination, they are not required," and "a statistical showing of disparate impact might suffice." *City of New York*, 717 F.3d at 84.

13

Few courts have addressed what a complaint must allege in order to state a pattern or practice claim, but Judge Abrams' helpful distillation of several cases in *Barrett v. Forest Laboratories, Inc.*, makes clear that while statistical evidence need not be pled in order to survive a motion to dismiss, allegations of statistical disparities go a long way toward making such a claim plausible. *See* 39 F. Supp. 3d 407, 429 (S.D.N.Y. 2014). For plaintiffs proceeding against an employer without statistical evidence, courts have found, "at least 'when there is a small number of employees, anecdotal evidence alone can suffice' to survive summary judgment." *Id.* at 430 (quoting *Sidor v. Reno*, 95-cv-9588 (KMW), 1997 WL 582846, at *10 (S.D.N.Y. Sept. 19, 1997)). Here, although the Court is considering Defendants' motion to dismiss, not a motion for summary judgment, the question of how many instances of alleged discrimination are sufficient to allege a pattern or practice of discrimination is still relevant given the lack of statistical evidence in the Third Amended Complaint and the large number of FAs at Morgan Stanley. Courts have found that "several isolated incidents, without more, are insufficient to allege a pattern or practice." *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 159 (S.D.N.Y. 2015); *see also Krish v. Conn. Ear, Nose & Throat, Sinus & Allergy Specialists, P.C.*, 607 F. Supp. 2d 324, 332 (D. Conn. 2009) (three instances of discrimination deemed insufficient to state a pattern or practice claim); *Rubinow v. Ingelheim*, 3:08-cv-1697 (VLB), 2010 WL 1882320, at *4 (D. Conn. May 10, 2010) (seven instances of discrimination found insufficient to state a pattern of practice claim); *but see United States v. Nobel Learning Cmtys., Inc.*, 676 F. Supp. 2d 379, 384 (E.D. Pa. 2009) (eleven or twelve instances of discrimination sufficient to state a claim); *Ste. Marie v. E. R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981) ("[T]he definition of a pattern or practice is not capable of a precise mathematical formulation.").

The Third Amended Complaint provides near-verbatim, boilerplate accounts of each Plaintiff's experience in Morgan Stanley offices in seven cities in the United States. Each Plaintiff alleges that he or she was "denied resources, support, and business opportunities and otherwise was treated worse than [his or her] colleagues who were not African Americans," that he or she was "isolated, ignored and excluded from office and business activities," and "denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs." (TAC ¶¶ 45 (Frazier), 54 (Abraham), 63 (Adepoju-Grace), 69 (Clark), 75 (Coleman), 84 (Pryor), 94 (Rada).) Each named Plaintiff also provides details as to his or her individual experience in a Morgan Stanley office. These accounts describe instances where white Morgan Stanley FAs chose to team or pool their resources and opportunities with other white FAs, to the exclusion of the Plaintiffs, who are all African American. Plaintiffs claim that these race-conscious teaming and pooling decisions resulted in their exclusion and isolation.

The Third Amended Complaint and Plaintiffs' Opposition all but acknowledge that the results of the allegedly discriminatory policy stem from the decisions and actions of individual employees, not an intentionally discriminatory policy or practice of the corporate defendants. (*See* TAC ¶ 38 ("The Firm does not ensure that these teams and corresponding client account transfers are not racially discriminatory."); Opp'n at 22 ("Plaintiffs allege that Morgan Stanley's national policy allowed FAs to make race-conscious selections of other FAs with

14

whom to team, and these racially discriminatory teaming practices help determine account distributions and segregate the workforce.")) As such, Plaintiffs' allegations give rise not to a pattern or practice claim of disparate treatment, but at most to a claim of disparate impact. Indeed, the case upon which Plaintiffs principally rely recognized the absence of intentional discrimination when discussing nearly identical teaming and pooling practices at Merrill Lynch. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir. 2012) (emphasis added); *see also id.* at 490 ("There is no indication that the corporate level of Merrill Lynch (or its parent, Bank of America) *wants* to discriminate against black brokers.").

As in *Merrill-Lynch*, Plaintiffs' allegations likewise do not give plausible support to the inference that a company-wide, intentionally discriminatory pattern or practice exists at Morgan Stanley. In fact, Plaintiffs provide no allegations from which discriminatory intent may be inferred. Instead, taking the allegations in the Third Amended Complaint as true, Plaintiffs have identified instances in which individual Morgan Stanley employees chose not to team or pool with Plaintiffs on the basis of their race. Even if these employees' subjective decisions were made possible by the teaming and pooling policies employed by Morgan Stanley, allegations do not support an inference of a pattern or practice of discriminatory treatment. *See, e.g., Nicholas v. Nynex, Inc.*, 974 F. Supp. 261, 267 (S.D.N.Y. 1997) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990 (1988)) ("Although there can be no assurance that particular individuals to whom an employer delegates authority will act without discriminatory intent, 'an employer's policy of leaving promotion decisions to the unchecked discretion of . . .

supervisors should itself raise no inference of discriminatory conduct.'"). Nor does the number of instances of discrimination identified by Plaintiff – seven employees, or roughly 0.044 percent of the 16,000 FAs who work at Morgan Stanley (TAC ¶ 1) – give rise to an inference of intentional discrimination at the firm-wide level. *See, e.g., In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1086 (W.D.N.Y. 1994) (anecdotal evidence of a small number of allegations of discrimination involving a large employer, without more, is insufficient to "give rise to an inference that defendant engaged in a corporate-wide pattern or practice of discrimination."); *see also Ste. Marie*, 650 F.2d at 405 ("[W]hen, as here, relevant statistics are lacking and the probative evidence of discrimination is confined, as we are assuming, to seven individual incidents, subjective decisionmaking methods are not sufficient to establish a pattern or practice of discrimination."); *id.* n.12 ("A different case would be presented if there were evidence that the challenged procedures had been adopted with the intent of facilitating discriminatory treatment."). Significantly, Plaintiffs do not allege that the teaming and pooling policies at issue were adopted with discriminatory intent.

Thus, the allegations in the Third Amended Complaint fall short of providing plausible support for the inference that "intentional discrimination was the defendant's 'standard operating procedure.'" *Robinson*, 267 F.3d at 158 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 336). Accordingly, Plaintiffs' pattern or practice of discrimination claims, whether based on Section 1981 or Title VII, must be dismissed.

2. Plaintiffs' Disparate Impact Theory

Plaintiffs alternatively allege, on a class-wide basis, that Defendants' teaming and

pooling policies resulted in a disparate impact on African American FAs.  Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  As noted above, a claim under Title VII need not allege that the defendant acted with discriminatory intent; alleging that a facially neutral policy resulted in a disparate impact on a protected group is enough to state a claim. Accordingly, a Title VII plaintiff may proceed under a disparate impact theory.

However, Title VII differs from Section 1981 in another important respect. Specifically, unlike a claim under Section 1981, Title VII requires that before a plaintiff may bring a claim, "the claims forming the basis of such a suit must first be presented in a complaint to the [Equal Employment Opportunity Commission ("EEOC")] or the equivalent state agency." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e–5).  The claims that a plaintiff may bring in a lawsuit pursuant to Title VII are limited to those contained in the EEOC complaint, also known as a charge, as well as those that are "reasonably related" to the allegations in the charge.  *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008) (internal citation and quotation marks omitted).    A claim is reasonably related if it "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Id.* (internal quotation marks omitted).

Significantly, a charge must be filed with the EEOC within 300 days of the day on which the last "discrete discriminatory act occurred," since "[e]ach discrete

discriminatory act starts a new clock for filing charges alleging that act."[7]  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Thompson v. Fed. Reserve Bank of N.Y.*, 242 F. Supp. 2d 368, 369 (S.D.N.Y. 2003) ("Where the alleged act of discrimination occurs in a state that has its own anti-discrimination laws and a state agency is empowered to enforce the laws, the charge of discrimination must be filed with the EEOC within 300 days after the date of the alleged unlawful act.").  Thus, "discrete discriminatory acts are not actionable" if they occurred more than 300 days before the filing of the EEOC complaint; this is true "even when they are related to the acts alleged in timely filed charges."  *Id.*    The fact that a case is premised on a policy's disparate impact does not change this rule:    "[t]o prevail on a disparate impact claim, a plaintiff must 'demonstrate[] that a respondent *uses a particular employment practice that causes a disparate impact*,'" and "every 'use' of an employment practice that causes a disparate impact is a separate actionable violation of Title VII with its own . . . 300-day statute-

---

[7] While courts typically analyze a motion to dismiss by considering the facts alleged in the complaint, when a defendant raises an exhaustion argument, the Court may also consider EEOC papers the parties provide to the court.  *See Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (district court properly considered the EEOC complaint when analyzing a Rule 12(b)(6) motion on exhaustion grounds); *Shands v. Lakeland Cent. Sch. Dist.*, No. 15-cv-4260 (KMK), 2017 WL 1194699, at *3 (S.D.N.Y. Mar. 30, 2017) ("[O]n a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court may consider EEOC filings because 'they are public documents' and are 'integral to [p]laintiff's claims.'" (quoting *Morris v. David Lerner Assocs.*, 680 F. Supp. 2d 430, 436 (E.D.N.Y. 2010)); *Kouakou v. Fideliscare N.Y.*, 920 F. Supp. 2d 391, 394 n.1 (S.D.N.Y. 2012) ("Because the EEOC [c]harge is part of an administrative proceeding, the [c]ourt may take judicial notice of it without converting [the] [d]efendant's motion into a motion for summary judgment.").

of-limitations clock." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 158 (2d Cir. 2012) (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)) (emphasis in original). The existence of a policy, or even the lasting effect of an application of that policy within the limitations period, is not enough. Rather, "a disparate impact claim requires plaintiffs to plead and prove that defendants, within the limitations period, *used* an employment practice that had a disparate impact. In other words, the *cause* – not merely the effect – must occur within the limitations period." *Id.* at 159 n.12 (2d Cir. 2012) (emphasis in original) (citing *Lewis v. City of Chicago*, 560 U.S. 205, 211 (2010)).

Plaintiffs bring their disparate impact claim on behalf of a putative class represented by just two of the named Plaintiffs in this suit – Frazier and Clark. (TAC ¶ 113.) To proceed on behalf of a putative class, a named plaintiff must have the legal ability to bring the claims he or she asserts. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 459 (S.D.N.Y. 2018). Accordingly, to proceed on their class theory, Plaintiffs Frazier and Clark must have timely filed complaints with the EEOC containing allegations that are "reasonably related" to the facts alleged in the TAC.

Frazier and Clark argue that they timely filed such charges, satisfying the administrative exhaustion requirement and thus permitting them to serve as representatives for a class-wide Title VII claim. (TAC ¶ 114.) However, neither of those charges provides any allegation from which the Court may conclude that a use, instance, or application of the allegedly unlawful policies occurred within 300 days of the date each was filed with the EEOC. Specifically, Frazier provides no allegations regarding the use or even the effect of those

policies during the four days between November 19, 2013 (300 days before she wrote a letter to the EEOC) and November 23, 2013 (which was apparently her last day at Morgan Stanley (*see* Mem. at 5; *see also* TAC ¶ 42 (alleging that Frazier's last day was in November 2013)).[8] Instead, Frazier's charge vaguely asserts that Morgan Stanley "unfairly distributed accounts to Asian and white males in my office." (Doc. No. 79-3 at 2.) She alleges that she complained about the discrimination to her Branch Managers, Glen Pacarro and Clyde Matsusaka, and that she resigned "because of the discrimination" on November 22, 2013. (*Id.*) However, she does not allege that accounts were unfairly distributed, or that the teaming and policies were applied in any other way, during the crucial six days.

Similarly, Clark provides no allegation from which the Court may infer a use or application of the teaming and pooling policies in the 12 days between May 20, 2015 (300 days before he filed his EEOC charge (Doc. No. 79-4)) and May 31, 2015 (the date he alleges was his last day at Morgan Stanley). Clark's EEOC complaint includes a six-page attachment that repeats verbatim much of the Third Amended Complaint. (Doc. No. 79-4.) However, the charge is completely lacking in details regarding the dates the policy was used or

---

[8] Frazier signed her EEOC charge on December 17, 2014 (Doc. No. 79-3), but neither Plaintiffs nor the charge itself indicate the day on which the charge was filed. However, Frazier wrote a letter to the EEOC complaining of discrimination at Morgan Stanley on September 15, 2014, which the Court will construe for the purposes of this motion as the date on which her charge was filed. (Doc. No. 79-2.) While Frazier's December 17, 2014 EEOC charge lists November 22, 2013 as the day she resigned, her September 15, 2014 letter lists September 25, 2013 as her last day. Again, given the statements in her opposition brief, the Court will construe Frazier's last day to be November 23, 2013 for the purposes of this motion.

applied to him. While it mentions that Clark "was not given the same opportunities as his white counterparts," "was excluded from . . . teaming opportunities," and "denied lucrative account transfers and distributions," it fails to identify any date that an account was unfairly distributed or team membership was denied to Clark.

Because neither EEOC complaint includes a single date on which Defendants' teaming and pooling policies were used or applied to Plaintiffs, Frazier and Clark cannot show that their charges were timely filed. *See Barroso v. Office of Gen. Counsel*, 12-cv-625 (RRM) (JMA), 2013 WL 4048496, at \*4 (E.D.N.Y. Aug. 9, 2013) (granting motion to dismiss where "plaintiff provide[d] no dates or context for these alleged statements; as such, plaintiff has not demonstrated that any such allegations fall within the 300-day rule."); *Hunter v. City of New York*, 88-cv-7429 (KTD), 1991 WL 177241, at \*2 (S.D.N.Y. Sept. 5, 1991) (dismissing complaint because "[w]ithout sufficient allegations with particularized dates, it is impossible to determine what, if anything, occurred within 300 days of [plaintiff's] EEOC filing").

Faced with these deficiencies, Plaintiffs nevertheless argue that, because they are challenging ongoing firm policies, the charges are timely "as long as the nationwide policies remain in place." (Opp'n at 19.) In support of this argument, Plaintiffs rely on *Morgan*, where the Supreme Court discussed what has come to be known as the "continuing violation doctrine." 536 U.S. at 101. There, the Supreme Court distinguished between unlawful employment practices that consist of "discrete acts," on one hand, and unlawful employment practices, like a hostile work environment, that by "their very nature involve[] repeated conduct" that "cannot be said to occur on any particular

day." *Id.* at 115. Instead, such conduct "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* In such cases, the Supreme Court concluded that "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *see also id.* at 118 ("In order for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment.").

However, even if the continuing violation doctrine applied to Plaintiffs' claims – a question that remains unresolved in this Circuit – that doctrine *still* requires Plaintiffs to allege "that an act contributing to the claim occur[ed] within the filing period," *Morgan*, 536 U.S. at 117, which neither charge does. In other words, "the continuing violation doctrine tolls the limitations period only until the last discriminatory act in furtherance of a continuous discriminatory practice or policy." *Oshinsky v. N.Y.C. Hous. Auth.*, 98-cv-5467 (AGS), 2000 WL 1225796, at \*6 (S.D.N.Y. Aug. 28, 2000) (internal quotation marks and citation omitted). "[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act. . . . Rather[,] the claimant must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999); *see also Carrasco v. N.Y.C. Off-Track Betting Corp.*, 858 F. Supp. 28, 32 (S.D.N.Y. 1994) ("[I]n order to maintain an

otherwise time-barred suit under the continuing violation exception, at least one discriminatory act pursuant to the policy must have occurred within the limitations period."), *aff'd*, 50 F.3d 3 (2d Cir. 1995). Accordingly, even assuming that the continuing violation doctrine applies to Plaintiffs' claims regarding the teaming and pooling policies at Morgan Stanley, neither Frazier's nor Clark's EEOC complaint alleges a "discriminatory act in furtherance of a continuous discrimination practice of policy" that occurred within the limitations period. Their disparate impact claims pursuant to Title VII are therefore time-barred.

In an attempt to salvage their individual claims, and therefore their class allegations, Plaintiffs argue that Clark's allegation of constructive discharge resuscitates his otherwise time-barred disparate impact allegations. However, the case cited as support for this argument, *Green v. Brennan*, 136 S. Ct. 1769 (2016), stands for the opposite proposition. In *Green*, the Supreme Court held that a constructive discharge claim is timely if the alleged constructive discharge took place within the 300-day window for a timely EEOC complaint; however, the "limitations period begins running on any separate underlying claim of discrimination when that claim accrues, regardless of whether the plaintiff eventually claims constructive discharge. The limitations-period analysis is always conducted claim by claim." *Id.* at 1782. Clark's assertion that he suffered a disparate, discriminatory harm based on Defendants' use of teaming and pooling policies is separate from his potential constructive discharge claim, which accrues separately and which will be discussed below, and his disparate impact claim is time-barred.

Plaintiffs further argue that Frazier and Clark's incomes were affected by the teaming and pooling policies, so that a discriminatory act occurred every time they were paid, citing the Lilly Ledbetter Fair Pay Act ("Ledbetter Act"), 42 U.S.C.A. § 2000e-5(e)(3)(A). However, the Second Circuit has made clear that "[a] plaintiff must plead and prove the elements of a pay-discrimination claim to benefit from the Ledbetter Act's accrual provisions." *Davis v. Bombardier Transp. Holdings (USA) Inc.*, 794 F.3d 266, 269 (2d Cir. 2015). The Second Circuit noted that the Ledbetter Act's generous accrual provisions are specifically intended to protect plaintiffs with pay discrimination claims, since those claims can be difficult to discover and often require an employee to compare his or her compensation to that of their co-workers. Those accrual provisions do not extend to claims regarding policies like Defendant's teaming and pooling policies, about which employees are put on notice "by the nature of how those decisions are communicated." *Id.* at 270. Nor are those provisions meant to apply to a claim that involves a "pay reduction that flows from another adverse employment action," such as the teaming and pooling policies. *Id.* at 271. Thus, plaintiffs may not "salvage [their] time-barred . . . claim[s] by virtue of a concomitant pay reduction." *Id.*; *see also Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.*, 866 F. Supp. 2d 147, 167-68 (E.D.N.Y. 2011) ("[T]he Ledbetter Act . . . applies only to discriminatory employment decisions specifically related to pay, and not to other employment decisions, even where such decisions directly affect pay. That is, the Ledbetter Act applies where the plaintiff claims that she was paid less than other employees for similar work.") (internal citations omitted).

For all these reasons, the Court concludes that Frazier and Clark have failed

to assert timely charges to the EEOC, and that each is barred from bringing Title VII disparate impact claims in federal court on the basis of the conduct set out in the TAC.

### 3. Defendants' Motion to Strike Plaintiffs' Claim for Nationwide Injunctive Relief

Defendants argue that Plaintiffs' request for class-wide injunctive relief must be struck because the policies and practices at issue in this case are already subject to comprehensive injunctive relief in the consent decree reached in *Jaffe*. Because the Court dismisses Plaintiffs' only class claims – the pattern or practice claims under Section 1981 and Title VII, and the disparate impact claims under Title VII – the Court need not reach this issue, since the only remaining claims are the individual claims of Frazier, Abraham, Adepoju-Grace, and Clark. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 966 (11th Cir. 2008) (noting that where a named plaintiff fails to "establish the alleged pattern or practice, the class claim" must be "dismissed," leaving the individual claims pending); *Coser v. Moore*, 587 F. Supp. 572, 605 (E.D.N.Y. 1983), *aff'd*, 739 F.2d 746 (2d Cir. 1984) ("The court's determination of the pattern and practice issue adversely to plaintiffs requires dismissal of the class action aspects of this case, which would leave for further disposition the claims of the individual plaintiffs."). Defendants' motion to strike Plaintiffs' request for class-wide injunctive relief is therefore rendered moot.

### B. Plaintiffs' Remaining Individual Claims

Plaintiffs bring an array of individual claims, including a Section 1981 race discrimination claim on behalf of Frazier, Abraham, Adepoju-Grace, and Clark (Count I); a Title VII race discrimination claim on behalf of Frazier and Clark (Count II); and claims for sex discrimination in violation of Title VII (Count III) and retaliation in

violation of Section 1981 (Count IV) on behalf of Fraizer alone. As noted above, Defendants do not attack Plaintiffs' individual Section 1981 race discrimination claims. Instead, they move against the individual claims set out in Counts II, III, and IV.

### 1. Frazier and Clark's Individual Title VII Employment Discrimination Claims

For the reasons articulated in section III.A.2. Frazier's Title VII individual claims must be dismissed because she has not alleged a discriminatory act occurring within the Title VII limitations period that supports either theory. Clark's individual Title VII claims must likewise be dismissed as untimely – with one exception. Specifically, Defendants concede that Clark's constructive discharge claim was timely made in his EEOC complaint. (TAC ¶ 73 ("Clark's inability to team and exclusion from account transfers, distributions, and other business opportunities and resources due to his race left [him] with no choice but to resign from Morgan Stanley."); Mem. at 8.) Defendants nevertheless move to dismiss that theory for failure to state a claim.

A plaintiff alleging employment discrimination on an individual basis under Title VII must plead facts that plausibly support the following elements: (1) the plaintiff is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) there is "at least minimal support for the proposition that [his] employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. With respect to the fourth element in particular, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to

discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.* Nevertheless, "[a] claim for discrimination under Title VII is properly dismissed where the plaintiff fails 'to plead any facts that would create an inference that any adverse action taken by any defendant was based upon [a protected characteristic of the plaintiff].'" *Williams v. Time Warner Inc.*, 09-cv-2962 (RJS), 2010 WL 846970, at *3 (S.D.N.Y. Mar. 3, 2010) (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (per curiam)); *see also EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) ("[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed.") (internal citations omitted).

The law is clear that a plaintiff may allege an adverse employment action in the form of constructive discharge. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004). Specifically, an employee may be deemed constructively discharged when his or her employer "*deliberately* makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Kader v. Paper Software, Inc.*, 111 F.3d 337, 339 (2d Cir. 1997) (quotation marks omitted) (emphasis in original). To show that the employer acted with the requisite intent, a plaintiff must "at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." *Petrosino*, 385 F.3d at 230 (2d Cir. 2004) (internal quotations marks and citation omitted). Working conditions are intolerable when, viewed as a whole, they are "so difficult or unpleasant that a reasonable person in the

employee's shoes would have felt compelled to resign." *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). Intolerable conditions cannot be established by a plaintiff's "dissatisf[action] with the nature of his assignments" or "feel[ing] that the quality of his work has been unfairly criticized." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993).

Clark contends – in his EEOC charge and in the TAC – that he was "constructively discharged in May 2015 because of his race."[9] (TAC ¶ 68; Doc. No. 79-4 at 1.) However, beyond generic boilerplate that tracks the nebulous language of the TAC, the only specific allegations put forward by Clark that might plausibly support a claim of constructive discharge are that "he was not given the same opportunities as his white counterparts" during his twelve months as a private banking advisory associate, that he "was denied lucrative account transfers and distributions," that his "non-African American peers received transfers that were much more valuable," and that for these reasons, he was left "with no choice but to resign from Morgan Stanley." (Doc. No. 79-4 at 5; *see also* TAC ¶¶ 68–72.)

But Clark does not provide any allegation to support an inference that his

---

[9] The parties' briefs do not address a constructive discharge claim for Frazier. In any event, constructive discharge is beyond the scope of Frazier's brief EEOC letter and charge, which allege only that her "rights were violated by the way accounts were distributed" (Doc. No. 79-2), that "accounts were taken from [her] in violation of [her] rights and against [her] will" (*id.*), and that she "resigned because of the discrimination" (Doc. No. 79-3). Accordingly, Frazier has failed to exhaust her administrative remedies with respect to a claim for constructive discharge under Title VII.

employer acted deliberately to cause his resignation – indeed, Clark fails to name any individual manager or supervisor to whom the requisite intent may be attributed. More to the point, as noted above, the intolerable conditions that Clark complains of were, by his own admission, the result of Morgan Stanley's teaming and pooling policies, not the deliberate conduct of Morgan Stanley or a supervisor. In short, Clark's constructive discharge claim mirrors his disparate impact claim, but as noted above, a disparate impact claim does not require proof of discriminatory intent, whereas a constructive discharge claim *does*. Accordingly, Clark has failed to state a claim for constructive discharge pursuant to Title VII.

## 2. Frazier's Individual Section 1981 Retaliation Claim

In Count IV of the Third Amended Complaint, Frazier alleges that she was subjected to retaliation in violation of Section 1981 as a result of her complaints about discrimination. (TAC ¶ 49, 127–29.) To state a claim for retaliation, a plaintiff must allege that: "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). As to the third element, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse" and that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). In *White*, the Supreme Court explained that it used the phrase "*material* adversity" because "it is important to separate

significant from trivial harms." *Id.* at 58. Thus, "anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (quoting *White*, 548 U.S. at 67.)

Frazier alleges that she was excluded from business opportunities, including from account distributions, because of her race and sex despite being "consistently ranked in the top tier of FAs." (TAC ¶ 46.) She complained about her exclusion and asked to see reports documenting account distributions and rankings, but her request was denied. (*Id.* ¶ 47.) Frazier supplies no further description of her complaints or requests, including their frequency or dates. Frazier alleges that she suffered retaliation in the form of a lack of investigation or corrective action, "increasing hostility by management[,] and continued exclusion from any valuable leads, referrals, and accounts distributions." (*Id.* ¶ 49.) Additionally, Frazier alleges that Morgan Stanley "continued to block [her] efforts to team and allowed male, non-African American FAs to poach client accounts" from her (*id.*), and that at one point her manager asked her when she was going to resign, which she took as a threat (*id.* ¶ 50).

While these allegations arguably set forth facts indicating that Frazier engaged in protected activity and that Morgan Stanley was aware of the activity, they do not establish the third or fourth element of a retaliation claim: a materially adverse action and a causal connection between the protected activity and the adverse action. First, Frazier has not alleged a materially adverse action. The Second Circuit has clearly instructed that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for

the filing of the same discrimination complaint." *Fincher*, 604 F.3d at 721. And Frazier's claim that she suffered "continued exclusion from any valuable leads, referrals, and accounts distributions" and that Morgan Stanley "continued to block her efforts to team" describes conduct that Frazier alleges had been occurring during Frazier's entire tenure at Morgan Stanley. (TAC ¶ 49.) Thus, according to the TAC, Frazier's "situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint," and therefore the continued exclusion does not constitute an adverse employment action. *Fincher*, 604 F.3d at 721.

What remains of Frazier's allegation of adverse action is that she faced "increasing hostility by management" after she complained and that her manager asked her when she was going to resign, which she took as a threat. Taken as true, these allegations, either individually or together, do not constitute an "adverse action." Indeed, another court in this Circuit has previously recognized that "questioning as to when [plaintiff] would retire" did not constitute an adverse employment action. *Leon v. Dep't of Educ.*, 16 F. Supp. 3d 184, 202 (E.D.N.Y. 2014), *aff'd in part, vacated in part on other grounds*, 612 F. App'x 632 (2d Cir. 2015). Frazier's allegations are far too conclusory to adequately describe an adverse employment action. Frazier makes no allegation as to any disciplinary action, much less an "injury or harm," even broadly construed, that resulted from the "increasing hostility by management" that she allegedly faced as a result of her complaint, nor does she articulate why or in what manner her manager's question as to when she was going to resign was threatening or an adverse action.

Frazier also fails to allege a causal connection between her complaint and the

alleged adverse action. Most of Frazier's allegations of adverse action are simply restatements of her evidence of discrimination. (*See, e.g.*, TAC ¶ 49 (alleging "continued exclusion from any valuable leads, referrals, and accounts distributions" and that Morgan Stanley "continued to block [her] efforts to team.").) Since these allegations describe a continuation of the same conduct that was occurring before Frazier complained, she cannot allege a "causal connection" between that treatment and her protected activity. Because Frazier's "retaliation claim must focus on the retaliation she suffered for complaining about the harassment, not on the initial harassment itself," she must show that the defendants "took an adverse employment action against her *in response to her complaints*." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (emphasis added). And although "[a] plaintiff may assert causal connection [either] through allegations of retaliatory animus, or else by circumstantial evidence, such as close temporal proximity between the protected activity and the retaliatory action," *Perry v. State of N.Y. Dep't of Labor*, No. 08-cv-4610 (PKC), 2009 WL 2575713, at *6 (S.D.N.Y. Aug. 20, 2009), *aff'd*, 398 F. App'x 628 (2d Cir. 2010), Frazier does neither here. The TAC simply states, in conclusory fashion, that, "[d]ue to her complaint of discrimination, Frazier suffered retaliation." (*Id.*) And Frazier provides no dates or indication of proximity between her complaints and the allegedly retaliatory action from which the Court may infer a causal connection. In any event, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

23

Accordingly, Frazier has failed to set forth facts sufficient to support an inference that she suffered retaliation in violation of Section 1981, and that claim must be dismissed.

## IV. CONCLUSION

Although Plaintiffs make myriad claims against Defendants, this case is, at bottom, a disparate impact action based on Defendants' teaming and pooling policies. Plaintiffs' allegations are obviously serious ones, with potentially-far-reaching consequences for African American financial analysts at Morgan Stanley. However, enforceable arbitration clauses bar several Plaintiffs from pursuing these claims in court, while other Plaintiffs are unable to overcome the stringent administrative exhaustion requirements for Title VII claims. Plaintiffs' remaining claims are ill-fitted to the facts alleged, as they attempt to stretch what is, in essence, a disparate impact case into something else. Accordingly, for the reasons stated above, the Court GRANTS Defendants' motions to (1) compel Coleman, Pryor, and Rada to individually arbitrate their claims and exclude them from participating in this case as class representatives, (2) dismiss Plaintiffs' pattern or practice of discrimination claims, (3) dismiss Frazier and Clark's Title VII disparate impact claims, (4) dismiss Clark's individual Title VII claim, (5) dismiss Frazier's individual Title VII claim, and (6) dismiss Frazier's individual Section 1981 retaliation claim. Defendants' motion to strike Plaintiffs' claims for class-wide injunctive relief is DENIED as moot.

IT IS HEREBY ORDERED that, by December 17, 2018, the parties shall submit a proposed case management plan and scheduling order for the remaining claims in this case – namely, the individual Section 1981 race discrimination claims alleged by Frazier, Abraham, Adepoju-Grace, and Clark.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 77.

SO ORDERED.

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: November 29, 2018
New York, New York

*      *      *

Plaintiffs Kathy Frazier, Yared Abraham, O. Emmanuel Adepoju-Grace, Andrew Clark, Kwesi Coleman, Jeanna Pryor, and Aisha Rada are represented by Jennifer S. Gilbert, Suzanne E. Bish, Linda D. Freidman, and Shona Glink of Stowell & Friedman, Ltd., 303 W. Madison Street, Suite 2600, Chicago, IL 60606, and Sharon R. Vinick and Darci E. Burrell of Levy Vinick Burrell Hyams LLP, 180 Grand Avenue, Suite 1300, Oakland, CA 94612.

Defendants Morgan Stanley, Morgan Stanley & Co., LLC, and Morgan Stanley Smith Barney LLC are represented by Mark S. Dichter, Andrew J. Schaffran, Blair J. Robinson, Brendan T. Killeen, and Sacha M. Steenhoek of Morgan, Lewis & Bockius LLP, 1701 Market Street, Philadelphia, PA 19103.