UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHY FRAZIER, YARED ABRAHAM, O. EMMANUEL ADEPOJU-GRACE, ANDREW CLARK, KWESI COLEMAN, JEANNA PRYOR, and AISHA RADA, on behalf of themselves and all others similarly situated,

        Plaintiffs,

v.

MORGAN STANLEY & CO., LLC, MORGAN STANLEY SMITH BARNEY LLC, AND MORGAN STANLEY,

        Defendants.

Case Action No. 16-cv-00804 (RJS)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR A PROTECTIVE ORDER**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1

II. FACTUAL BACKGROUND .........................................................................................2

    A. Plaintiffs' Remaining Claims Are Individual And Local In Nature.......................2

    B. Plaintiffs' Served Subpoenas Requesting Extensive Discovery Related To Dismissed Claims And Requesting Relevant Discovery That MS Has Already Agreed To Produce ...................................................................................4

III. ARGUMENT ...................................................................................................................7

    A. Legal Standard ........................................................................................................7

    B. Good Cause Exists For A Protective Order............................................................7

        1. The Documents That Plaintiffs Seek Through The Subpoenas Beyond Those MS Has Agreed To Produce And Their Requests For Nationwide Studies Are Not Relevant To Their Individual Claims...........................................................................................................7

        2. The Nationwide Studies and Analyses That Plaintiffs Seeks From MS Are Not Relevant to Plaintiffs' Individual Claims ..........................12

        3. The DM Communications That Plaintiffs Seek Beyond Those MS Agreed To Produce Are Not Relevant To Plaintiffs' Individual Claims.........................................................................................................13

        4. Plaintiffs Have Had Ample Opportunity To Obtain All Relevant Documents Through Discovery From MS. ..............................................14

IV. CONCLUSION ..............................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allstate Ins. Co. v. All Cnty., LLC*,
 No. 19-7121, 2020 WL 5668956 (E.D.N.Y. Sept. 22, 2020) ..................................................... 7

*Mandala v. NTT Data, Inc.*,
 975 F.3d 202 (2d Cir. 2020) .................................................................................................... 11

*Thornton v. Morgan Stanley Smith Barney, LLC*,
 No. 12-0298, 2013 WL 5738991 (N.D. Okla. Oct. 22, 2013) ................................................. 12

*Warnke v. CVS Corp.*,
 265 F.R.D. 64 (E.D.N.Y. 2010) ................................................................................................ 7

**Other Authorities**

Fed. R. Civ. P. 26 ............................................................................................................. 1, 7, 14, 15

Fed. R. Civ. P. 45 ............................................................................................................................ 7

Defendants Morgan Stanley & Co. LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley (collectively, "Defendants" or "MS") submit this Memorandum of Law in support of their Motion for a Protective Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

## I.   INTRODUCTION

Plaintiffs Kathy Frazier ("Frazier"), Yared Abraham ("Abraham"), and O. Emmanuel Adepoju-Grace ("Adepoju-Grace") (collectively, "Plaintiffs") each assert an individual Section 1981 disparate treatment claim. As this Court previously found, Plaintiffs' individual race discrimination claims are predicated upon isolated employment decisions, made by individual managers and colleagues, at local branch offices, at different times, and for different reasons. *See* Dkt. 104 at 14-15. Notwithstanding their claims' limited scope, Plaintiffs continue to demand expansive nationwide discovery from MS and now through subpoenas *duces tecum* served on former non-party Diversity Monitors ("DMs") Cathy Pepe ("Pepe"), Fred Alvarez ("Alvarez"), and Alvarez's former law firm ("Subpoenas"). Plaintiffs' Subpoenas and requests for nationwide discovery are improper and unjustified.

The documents that Plaintiffs seek beyond those Defendants already agreed to produce are outside the scope of any relevant discovery in this case and are unduly burdensome. Plaintiffs' claims involve highly individualized and fact specific inquiries into the separate and distinct individual decisions made relating to their employment in their former branch offices. As Plaintiffs admitted in their motion seeking an immediate appeal "discovery and trial on the remaining claims are likely to be more tightly focused on the remaining individual plaintiffs ***and the specific circumstances of race discrimination they faced at their Morgan Stanley branches***." Dkt. 153 at 21 (emphasis added). MS has already agreed to produce the relevant

1

documents, information, and communications covered by the Subpoenas regarding what transpired at their local branches and the former DMs' analysis of Plaintiffs' claims. Yet, both through the Subpoenas and directly from MS, Plaintiffs continue to demand production of nationwide documents, data and studies relating to all Financial Advisors and Financial Advisor Trainees at all of MS' hundreds of branch offices, as well as every communication the former DMs ever exchanged with any MS employee regardless of subject. The additional documents that Plaintiffs seek have no relevance to or bearing on their individual claims.

Plaintiffs' Subpoenas also seek documents that are currently the subject of a dispute pending before this Court. Their Subpoenas are therefore a transparent attempt to circumvent the proper scope of discovery in this action and any limitation on the scope of claims and discovery Your Honor sets. And, the former DMs and Alvarez's former law firm should not be required to expend time and resources reviewing their files to produce the same, relevant documents and information that MS has already agreed to produce.

The Court should, therefore, issue a protective order prohibiting Plaintiffs' use of these third-party subpoenas and deny Plaintiffs' requests for nationwide discovery.

## II.   FACTUAL BACKGROUND

### A.   Plaintiffs' Remaining Claims Are Individual And Local In Nature.

This Court dismissed Plaintiffs' Section 1981 and Title VII pattern or practice and disparate impact claims more than two years ago. Dkt. 104. In dismissing Plaintiffs' class claims, this Court explained that their allegations were predicated on the acts and decisions of individual employees and failed to "give rise to an inference of intentional discrimination at the firm-wide level." Dkt. 104 at 15; *see also Id*. at 14 ("[T]he results of the allegedly discriminatory policy stem from the decisions and actions of individual employees, not an

intentionally discriminatory policy or practice of the corporate defendants.").

Plaintiffs' own allegations highlight that their remaining claims are limited in scope to actions taken at their local branches by their respective managers and colleagues. For example:

- "As one of only two African American FAs *in her office* of approximately 80 FAs, *Frazier was isolated, ignored, and excluded from office and business activities*. Frazier was denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs." Dkt. 60, ¶ 45 (emphasis added).

- Frazier "received no leads or referrals and was excluded from lucrative account transfers and distributions when FAs with substantial books of business retired or left the Firm, which happened dozens of times *while Frazier worked in the Honolulu office*." Dkt. 60, ¶ 46 (emphasis added).

- "Management provided false and pretextual reasons for transferring accounts exclusively to non-African American FAs. For example, *management claimed Frazier's ranking among the FAs in the office* precluded her from receiving account distributions." "When *Frazier confronted her manager* … the manager responded that 'what's done is done, we cannot change the past,' or words to that effect." Dkt. 60, ¶ 46 (emphasis added).

- "Frazier was subjected to *increasing hostility by management* and continued exclusion from any valuable leads, referrals, and account distributions." Dkt. 60, ¶ 49 (emphasis added).

- *Frazier's* "*manager* asked [her] when she was going to resign, which she took as a threat. As a result, Frazier had no choice but to leave Morgan Stanley in 2013." Dkt. 60, ¶ 50 (emphasis added).

- "As one of only two African American FAs *in the office*, *Abraham was isolated, ignored, and excluded from office and business activities*. Like other African American FAs, Abraham was denied the mentoring, coaching, management and administrative support, financial support for marketing efforts, and other support that was routinely given to non-African American FAs." Dkt. 60, ¶ 54 (emphasis added).

- "Although many of *the non-African American FAs in the Honolulu office* were on teams, including teams designed for succession planning, Abraham was excluded from favorable teaming opportunities. As a result, Abraham tried to form a team with a young Caucasian male trainee, whom he mentored and provided with client accounts and production. *This opportunity was not comparable to the other teams in the office*[.]" Dkt. 60, ¶ 55 (emphasis added).

- "*Abraham's managers* undermined the [teaming] relationship, however, before the

3

trainee could mature into a productive team member." Dkt. 60, ¶ 55 (emphasis added).

- "Abraham was viewed and treated differently because of his race. *A banker in the Honolulu office* repeatedly and publicly called Abraham racially offensive names without repercussion. The only other African American *in the office* was similarly mocked based on her race and racial stereotypes." Dkt. 60, ¶ 57 (emphasis added).

- "Morgan Stanley regularly held national conferences for minority FAs, which were attended by numerous FAs *from the Honolulu branch office*, who were Asian. Even though Abraham was one of only two African American FAs in an office of approximately 80 FAs, he was never invited to attend one of the minority conferences." Dkt. 60, ¶ 58 (emphasis added).

- "Frustrated by…hostility from *co-workers and management*…Abraham had no choice but to leave the Firm in October 2013." Dkt. 60, ¶ 60 (emphasis added).

- "As one of only two African American FAs among approximately 45 FAs *in the Wilmington office*, *Adepoju-Grace was isolated, ignored, and excluded from office and business activities*. Like other African American FAs, Adepoju-Grace was denied the mentoring, coaching, resources, and management, sales and administrative support routinely given to his non-African American colleagues." Dkt. 60, ¶ 63 (emphasis added).

- "Many if not all of *Adepoju-Grace's white peers in the Wilmington office* were on teams, which enabled the white trainees to meet the performance goals of the training program." Dkt. 60, ¶ 64 (emphasis added).

- "In addition to being excluded from teams and client account transfers, Adepoju-Grace was denied basic training and mentoring *provided to his white colleagues*, who were invited to participate in telephone calls between senior FAs and clients or prospective clients, among other things." Dkt. 60, ¶ 66 (emphasis added).

As these allegations make clear, Plaintiffs' individual disparate treatment claims are inherently local in nature.

### B. Plaintiffs' Served Subpoenas Requesting Extensive Discovery Related To Dismissed Claims And Requesting Relevant Discovery That MS Has Already Agreed To Produce.

Two days after asking the Court to compel broad, class discovery, Plaintiffs served the Subpoenas on Pepe, Alvarez, and Alvarez's former law firm seeking virtually the same documents sought in their pre-motion letter, plus additional documents and communications

4

related to Pepe's and Alvarez's roles as former DMs in three prior MS discrimination class action settlements: *Jaffe, et al. v. Morgan Stanley & Co., Inc.*, Case No. C 06-03903-THE (N.D. Cal.), *Augst-Johnson et al. v. Morgan Stanley & Co., Inc.,* Case No. 1:06-cv-01142-RAR (D.D.C.), *Amochaev, et al. v. Citigroup Global Markets, Inc., d/b/a Smith Barney*, Case No. C-05-1298-PJH (N.D. Cal.).  Specifically, the Subpoenas request:

> Any and all documents, including all electronically stored information in your possession custody or control relating to:
>
> a.   Kathy Frazier (former Morgan Stanley Financial Advisor);
>
> b.   Yared Abraham (former Morgan Stanley Financial Advisor);
>
> c.   O. Emmanuel Adepoju-Grace (former Morgan Stanley Financial Advisor Trainee);
>
> d.   Cathy Pepe or Fred Alvarez's role as Settlement Monitors for [*Jaffe, Augst-Johnson* and *Amochaev*], including but not limited to correspondence, documents, reports, analyses, metrics or data you received from or provided to Morgan Stanley & Co., or any other individuals in fulfilment of your duties and responsibility as the Diversity Monitor relating to race, gender, EEO-1 reporting, diversity, teaming, compensation, account redistributions, inherited assets, exceptions to Morgan Stanley's redistribution policies, the Financial Advisor Associate ("FAA") training program; retention of FAAs and conversation [sic] from FAA to FA and Joint Production Agreements ("JAPS") [sic];
>
> e.   Morgan Stanley's Honolulu, Hawaii Branch Office or any Complex that included the Honolulu, Hawaii Branch Office, Branch #129 or Complex #008;
>
> f.   Morgan Stanley's Wilmington, Little Falls or Greenville Branch offices, the Greater Philadelphia Complex or Branch Office #502, Branch Office #532 or Complex #802;
>
> g.   Any communications, including email, text messages, letters, media or other form of communication, between, or on behalf of, Cathy Pepe or Fred Alvarez and (1) Mark Greenfield; (2) Kara Underwood; (3) Jessica Krentzman; (4) Cira Nickerson; (5) Vincent Lumia; (6) Morgan Stanley's Head of Diversity and Inclusion; (7) Morgan Stanley's Head of the Field for Wealth Management; or (8) other Morgan Stanley personnel; [and]
>
> h.   Any records maintained by Cathy Pepe and transferred to Frederick (Fred) Alvarez.

Declaration of Mark S. Dichter ("Dichter Decl."), Exhibit ("Ex.") A at ¶ 1.

At the time Plaintiffs served the Subpoenas, MS had already agreed to produce all of the documents and data sought by Subpoena Paragraphs a, b, and c, and Paragraphs e and f for the

Plaintiffs' branches during the relevant period. Dichter Decl., Ex. A at ¶¶ 1(a)-(c), (e), (f). MS agreed to produce: (1) the DMs' files regarding each of the Plaintiffs in their entirety (*id.* at ¶¶ 1(a), (b), and (c)); (2) the DMs' files regarding Plaintiffs' respective branches in their entirety (*id.* at ¶¶ 1(e), (f)); (3) any communications between the DMs and MS employees (including Plaintiffs), or within Plaintiffs' or their managers' ESI containing the DMs' names or e-mail addresses, relating to Plaintiffs' specific claims or allegations (*id.* at ¶ 1(g)); (4) any communications within the ESI for Jessica Krentzman ("Krentzman"), the individual who investigated Abraham's and Frazier's post-employment complaints of alleged discriminatory treatment and who communicated with the DMs regarding those complaints, regarding Plaintiffs Abraham and Frazier (*id.*); and (5) Krentzman's investigation file, which includes her communications with the DMs. *Id*. at ¶¶ 1(a), (b), (c), (e), (f).[1]

Despite this case's posture and MS's document production agreements, Plaintiffs nonetheless served their extensive and unduly burdensome requests on the DMs through the Subpoenas. The parties' only disputes with respect to the documents sought by the Subpoenas are over paragraph 1(d) to the extent that Plaintiffs are seeking documents beyond their respective branches during the statutory period, paragraph 1(g) to the extent that Plaintiffs are seeking all communications with MS personnel, including on topics and with individuals that have no connection to Plaintiffs' individual claims, and the catch all request in paragraph 1(h).

---

[1] In addition to the discovery sought through the Subpoenas, MS also agreed to produce: (A) documents regarding participation in, requirements of, and any benefits, advantages or disadvantages of teams provided to Plaintiffs' branches during the statutory period; (B) any study of compensation, teaming, account distribution, and training program performance of African American Financial Advisors or Financial Advisor Trainees, in Plaintiffs' respective branches during the statutory period; and (C) broad data, including all Financial Advisor and Financial Advisor Trainee demographic data for Plaintiffs' branches, all compensation and Medicare wage data for Plaintiffs' branches, and all account redistribution and teaming data for Frazier's and Abraham's branch going back to June 1, 2009.

### III.  ARGUMENT

#### A.  Legal Standard.

Subpoenas issued under Rule 45 are subject to Rule 26(b)(1)'s overriding relevance requirement. *See Warnke v. CVS Corp.*, 265 F.R.D. 64, 66 (E.D.N.Y. 2010) ("A subpoena issued to a non-party pursuant to Rule 45 is 'subject to Rule 26(b)(1)'s overriding relevance requirement.'") (citation omitted); Fed. R. Civ. P. 26(b)(1) (only permitting discovery that is relevant to a party's claims or defenses and proportional to the needs of the case). In order to prevent improper discovery, a party to an action can move for a Rule 26(c) protective order with respect to a Rule 45 subpoena served on a third-party. *See Allstate Ins. Co. v. All Cnty., LLC*, No. 19-7121, 2020 WL 5668956, at *2, *4 (E.D.N.Y. Sept. 22, 2020) (explaining that "standing is beside the point where the objection to the subpoena is on relevance or proportionality" and that the "overbroad nature of the subpoenas warrants a protective order"). Courts have broad discretion under Rule 26 in controlling discovery, which states that the Court "must limit the frequency or extent of discovery" if it determines (i) the discovery sought is "unreasonably cumulative or duplicative"; (ii) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or (iii) the discovery sought is irrelevant, privileged, or not proportional to the needs of the case. Fed. R. Civ. P. 26(b)(2)(C). MS is entitled to a Rule 26(c) protective order regarding the non-party Subpoenas to prevent improper discovery and to control the scope of discovery in this case.

#### B.  Good Cause Exists For A Protective Order.

1.  <u>The Documents That Plaintiffs Seek Through The Subpoenas Beyond Those MS Has Agreed To Produce And Their Requests For Nationwide Studies Are Not Relevant To Their Individual Claims.</u>

Plaintiffs' Subpoenas request the production of every document without any limitation to

Plaintiffs' claims that the former DMs sent or received in conjunction with the prior class action settlements, including all unrelated "correspondence, documents, reports, analyses, metrics or data… relating to race, gender[2],[including nationwide] EEO-1 reporting, diversity, teaming, compensation, account redistributions, inherited assets, exceptions to Morgan Stanley's redistribution policies, the [FAA] training program, retention of FAAs and conversation [sic] from FAA to FAA and Joint Production Agreements." Dichter Decl., Ex. A at ¶ 1(d). This Court should issue a protective order because (a) Plaintiffs' requests for nationwide studies have no relevance to Plaintiffs' disparate treatment claims based on alleged intentional discrimination within their branches; and (b) the documents that Plaintiffs seek through the Subpoenas relating to Plaintiffs' and their respective branches during the relevant time period are duplicative of the documents MS already agreed to produce and are otherwise not relevant to any claim or defense in this action.

Plaintiffs' own allegations make clear the scope of this case is restricted to alleged discrete adverse employment actions that occurred in Plaintiffs' respective branches and that are attributable to local managers or co-workers. Plaintiffs Frazier and Abraham allege that they were subjected to race discrimination during their employment based on actions taken by individual managers in their local branch in Hawaii, such as the denial of account distributions, teaming opportunities, managerial and administrative support, and other business opportunities. Dkt. 60, ¶¶ 45-46, 54-56; Dkt. 170 at 1. Frazier and Abraham also allege that local branch managers in Hawaii allowed other Financial Advisors in Hawaii to poach their clients. *Id.* Plaintiff Adepoju-Grace similarly alleges that he was subjected to race discrimination based on

---

[2] Plaintiffs' continued requests for gender-related discovery is patently improper as the Court dismissed Frazier's gender-based claims two years ago and there are no other claims or allegations in this action predicated on gender. Dkt. 104 at 20-23.

actions taken by different, individual managers in his local branches in Delaware, including his "exclu[sion] from teams, pools client assets, and account distributions." Dkt. 60, ¶¶ 63-66; Dkt. 170 at 1. All Plaintiffs claim that they were treated differently than non-African American Financial Advisors who worked in their respective branch offices in Hawaii and Delaware. *Id.* Plaintiffs' individual discrimination claims are inherently fact- and context-specific. In order to determine whether Frazier, Abraham, and Adepoju-Grace were treated differently than non-African American employees in their respective branches, the Court has to undertake an individualized analysis of the unique facts, circumstances, and context surrounding their respective employment and claims, and the individualized and local decisions they allege were discriminatory. For example, in order to assess whether Frazier or Abraham were denied a specific account distribution in the Honolulu, Hawaii Branch because of their race, the trier of fact will need to analyze: (1) which Financial Advisors received the account distributions Plaintiffs claim that, but for race discrimination, they should have received; and (2) the local manager's reason for distributing the accounts to said Financial Advisors. Likewise in order to determine why Frazier or Abraham were denied the opportunity to join a specific team or partnership, the trier of fact will need to understand: (1) the underlying relationship between the individual Financial Advisors or Financial Advisor Trainees on the team or partnership; (2) whether those individuals had any conversations with Frazier or Abraham about teaming or partnering; and (3) the rationale for creating the team or partnership. The relevant scope of discovery needs to be limited to the discrete actions that individual managers and colleagues took in each of the Plaintiffs' local branches during their employment. Plaintiffs cannot credibly argue otherwise.

   Plaintiffs previously conceded that this Court's dismissal of their Section 1981 and Title

9

VII pattern or practice and disparate impact claims precludes the expansive discovery that they now seek. In arguing for an immediate appeal, Plaintiffs represented that discovery on the "dismissed claims would have focused on Morgan Stanley's nationwide policies and practices," but discovery on the remaining claims will "be more tightly focused on the remaining individual plaintiffs *and the specific circumstances of race discrimination they faced at their Morgan Stanley branches*." Dkt. 153 at 21 (emphasis added). Now, despite the admittedly localized nature of their remaining individual Section 1981 intentional discrimination claims, Plaintiffs are seeking irrelevant, nationwide discovery, which might only be possibly relevant to their dismissed class disparate impact claims. *See supra* I and II.A.

Plaintiffs attempt to justify their expansive nationwide discovery by arguing that the studies could show how policies "have a disparate impact on African-Americans," "the statistical impact of these policies on black Financial Advisors," and "how are Morgan Stanley's policies and practices impacting black Financial Advisors." Dichter Decl., Ex. B at 43:23-24; 44:1-2; 44:9-13. However, there is no disparate impact claim remaining in this case. And, as this Court previously recognized, "[e]ven if these employees' subjective decisions were made possible by the teaming and pooling policies employed by Morgan Stanley, allegations do not support an inference of pattern or practice of discriminatory intent." Dkt. 104 at 15.

Even if Plaintiffs could infer discriminatory intent from an alleged, speculative disparate impact (they cannot), Plaintiffs' discovery remains focused on an incorrect and irrelevant population. Plaintiffs allege that they were excluded from favorable teams, denied account redistributions, had their clients poached, and were treated less favorably by their managers and coworkers at their respective branches. As Financial Advisors in Honolulu, Frazier and Abraham were unaffected by decisions at any of the other MS branches. Similarly, to the extent

10

that Adepoju-Grace was eligible for any account redistributions or teaming opportunities or denied any coaching, the decisions were made by his local managers and colleagues in Delaware.

The requested documents[3] encompass information on hundreds of MS branches in geographic areas that Plaintiffs did not work and have no bearing on their individual disparate treatment claims. Whether there was a lower percentage of African Americans on teams in the aggregate when one looks at all branches nationwide does not provide any basis for a jury finding that the Plaintiffs were not allowed to join teams in their branches because of their race. These national studies that Plaintiffs seek would not even be relevant if they were pursuing a disparate impact claim. *See Mandala v. NTT Data, Inc.*, 975 F.3d 202, 212 (2d Cir. 2020) (in order "to rely on national statistics to plead a disparate impact claim, [plaintiffs] must explain why those statistics can plausibly be expected to hold true for the …pool in question" and plaintiffs cannot "rely on conclusory statistical inferences to force their way into discovery"). In order to draw any meaningful conclusions from the requested analyses and studies, they must be limited in scope to the locations where the alleged employment decisions affecting Plaintiffs were made; otherwise, it is impossible to determine which locations impact the data.[4] Likewise, a nationwide study on whether account redistribution "exceptions" have a disparate impact on African Americans nationwide bears no relevance on why certain "exceptions" may have been made by local managers in Honolulu or Delaware, and whether those decisions were made because of intentional race discrimination.

---

[3] At the pre-motion conference on February 18, Plaintiffs conceded that they are only seeking summaries and reports related to MS' policies, and not the underlying nationwide data for teaming, account distributions, demographics, or compensation. Dichter Decl., Ex. B at 43:6-45:6. To the extent Plaintiffs still seek such nationwide data, Plaintiffs' request is improper for the same reasons set forth above.

[4] As explained *supra* I and II.B. MS has already agreed to produce this relevant subset, including any study of compensation, teaming, account distribution, and training program performance of African American Financial Advisors or Financial Advisor Trainees, in Plaintiffs' respective branches during the statutory period.

Because the nationwide documents that Plaintiffs seek are not relevant to their individual, disparate treatment claims, this Court should issue a protective order to prevent third parties to suffer the burden to produce irrelevant documents that have no relevance to the Plaintiffs' remaining individual discrimination claims. *See, e.g., Thornton v. Morgan Stanley Smith Barney, LLC*, No. 12-0298, 2013 WL 5738991, at *2 (N.D. Okla. Oct. 22, 2013) (issuing a protective order to prevent the disclosure of class action claim forms from the *Amochaev, et al. v. Citigroup Global Markets, Inc., d/b/a Smith Barney* settlement where the documents sought were not relevant to the plaintiff's discrimination claims, because the *Amochaev* case involved different types of allegations over a different time frame and were not relevant for impeachment of plaintiff's branch manager).

        2.      <u>The Nationwide Studies and Analyses That Plaintiffs Seeks From MS Are Not Relevant to Plaintiffs' Individual Claims.</u>

In addition to the extensive non-relevant documents sought through the Subpoenas, Plaintiffs are also seeking nationwide studies on "account distribution, exceptions, teaming, and other policies that did had a disparate impact on African-Americans." Dichter Decl., Ex. B at 43:22-24. None of the studies are relevant to the issues remaining in this case: whether Plaintiffs managers and co-worker intentionally discriminated against them because of their race. For example, Plaintiffs claim that the studies regarding teaming are relevant to the "benefit of teaming to financial advisors." *Id.* at 44:16-17. However, any nationwide studies with respect to the value of being on a team has no relevance to the issue of whether Plaintiffs were precluded by their managers or co-workers from joining a team. Nor could such studies be relevant to the issue of damages as Plaintiffs claim. If Plaintiffs are able to prove that their managers or co-workers precluded them from joining a team because of their race, any potential damages would

be based on how much their comparators in their branch earned from being on the team.

The same is true with respect to with respect to account redistributions. Plaintiffs claim that studies regarding account redistributions and exceptions are relevant, because they show that Morgan Stanley "knew" that "exceptions and other things were being made to harm African-American financial advisors." *Id.* at 45:16-21. The critical inquiry for Plaintiffs' remaining claims is not, however, whether exceptions may have been made in the aggregate that have a disparate impact on African-American Financial Advisors. It is whether exceptions were made by local managers in Hawaii and Delaware because of intentional race discrimination, and whether *but for* Plaintiffs' race they would have received certain additional accounts from the distribution process that occurred in their branches in Hawaii and Delaware. Any potential damages stemming from allegedly discriminatory distributions of accounts will likewise stem from the actual account redistributions that Plaintiffs can prove they would have received but for intentional race discrimination – not from a nationwide study on whether the account distribution policy has a disparate impact on African Americans as a whole.

The nationwide studies and analyses that Plaintiffs seek are not relevant to their individual disparate treatment claims and their requests should be denied.

3. <u>The DM Communications That Plaintiffs Seek Beyond Those MS Agreed To Produce Are Not Relevant To Plaintiffs' Individual Claims.</u>

In addition to their request for all documents, studies, and analyses that the DMs sent or received nationwide, Plaintiffs are also seeking every communication that the DMs ever exchanged with each other or any MS employee, including MS' in-house employment counsel, MS' Regional Head of Employee Relations, MS' Head of Diversity for Wealth Management, and MS' Head of Field Management on any subject during their entire tenure as DMs. Dichter Decl., Ex. A at ¶ 1(g). Plaintiffs' request is not limited to the Plaintiffs' branches or their

individual claims – communications MS has already agreed to produce. There can be no justification for requesting the production of communications between the DMs and MS regarding the creation of teams or account redistributions in geographic locations where they did not work, or during periods of time that they were not employed with MS, or any other matters. These requests are clearly not proportional to the needs of this case, or likely to lead to the discovery of admissible evidence. And, even if the Subpoenas were limited geographically, temporally, or topically, they would still be improper and unnecessary because MS has already agreed to produce all of the relevant documents. *See supra* I. and II.B. The former DMs should also not be obligated to incur the burden and expense of responding to the Subpoenas. This Court should, therefore, issue a protective order to eliminate the unnecessary and unjustified burden the Subpoenas would impose on the former DMs and prevent the disclosure of irrelevant communications that have no bearing on the Plaintiffs' remaining individual discrimination claims.

    4.    <u>Plaintiffs Have Had Ample Opportunity To Obtain All Relevant Documents Through Discovery From MS.</u>

Good cause further exists for a protective order, because Plaintiffs have had ample opportunity to obtain the relevant subpoenaed documents directly from MS and are using the non-party Subpoenas as an end-run around the discovery process. *See* Fed. R. Civ. P. 26(b)(2)(C)(ii) ("On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that…(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action…."). As set forth above, MS has already agreed to produce all documents and information that are relevant and proportional to Plaintiffs' individual discrimination claims. *See supra* I. and II.B. Dissatisfied with Defendants' appropriate limitations on the scope of their

14

production, Plaintiffs filed a letter seeking to compel the documents on a nationwide basis and for a larger time period. Dkt. 170. Without waiting for an order from the Court, Plaintiffs served Subpoenas on the former DMs. The documents that Plaintiffs seek through their Subpoenas relate to the broader discovery issue that is presently pending before this Court. Plaintiffs should not be permitted to use Subpoenas to circumvent the proper discovery process and evade any anticipated ruling from this Court.

Given that Plaintiffs have had the opportunity to obtain the documents at issue through discovery from MS, good cause exists for this Court to issue a protective order.[5]

## IV. CONCLUSION

Good cause exists for a protective order as to Plaintiffs' Subpoenas because the expansive, nationwide documents that they seek are irrelevant to their individual disparate treatment claims, and because MS has already agreed to produce the documents that are relevant and proportionate to their branches and individual allegations. The nationwide studies Plaintiffs seek are also not relevant to their individual, intentional discrimination claims. Defendants therefore respectfully request that the Court grant their Motion for a Protective Order and prohibit Plaintiffs from circumventing this Court and seeking irrelevant documents from the former DMs, and deny Plaintiffs' request for nationwide studies and reports.

---

[5] A protective order is further warranted to the extent that the documents Plaintiffs are seeking from the DMs are cumulative and duplicative of documents that MS has already agreed to produce. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Pepe, Alvarez, and Alvarez's former law firm should not be required to search through many boxes of documents to locate the same documents that MS has already agreed to produce through discovery.

Dated:  March 5, 2021

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

/s/ *Mark S. Dichter*
Mark S. Dichter (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
Phone: 215-963-5000
Fax: 215-963-5001
Email: mark.dichter@morganlewis.com

Brendan T. Killeen
Nicole M. Zito
101 Park Avenue
New York, NY 10178-0060
Phone: 212-309-6000
Fax:  212-309-6001
Email:  brendan.killeen@morganlewis.com
             nicole.zito@morganlewis.com

*Attorneys for Defendants*

16

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

I hereby certify that a true and correct copy of the foregoing was filed electronically and served on all counsel of record on March 5, 2021 via the Court's ECF/CM system.

*/s/ Mark S. Dichter*
March S. Dichter