UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATHY FRAZIER, YARED ABRAHAM,
and O. EMMANUEL ADEPOJU-GRACE,

Plaintiffs,

-v-

MORGAN STANLEY & CO., LLC,
MORGAN STANLEY SMITH BARNEY
LLC, and MORGAN STANLEY,

Defendants.

No. 16-cv-804 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiffs, a group of African American employees, commenced this action against their former employers, Morgan Stanley & Co., LLC, Morgan Stanley Smith Barney LLC, and Morgan Stanley (collectively, "Morgan Stanley") in 2015. Asserting individual and class claims, the employees alleged that Morgan Stanley engaged in both disparate treatment and disparate impact employment discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1, *et seq.* ("Title VII"). In November 2018, the Court dismissed all claims in the case except the individual disparate treatment claims brought by Kathy Frazier, Yared Abraham, and O. Emmanuel Adepoju-Grace ("Plaintiffs") under Section 1981.[1] (*See* Doc. No. 104.)

After staying and extending discovery multiple times as requested by the parties, the Court issued a revised case management plan and scheduling order in October 2020 and set a deadline

---

[1] All other employee plaintiffs have been dismissed from this case – including Andrew Clark, who was not dismissed in the Court's 2018 order but was voluntarily dismissed from the case in January 2020. (*See* Doc. No. 151.)

of February 22, 2021 for the completion of all fact discovery and depositions. (Doc. No. 169 at 1.) At the parties' joint request, the Court held a conference on February 18, 2021 to address several unresolved discovery disputes between the parties. (Doc. No. 172; *see also* Doc. Nos. 170, 171, 173.) Thereafter, Morgan Stanley moved for a protective order with respect to subpoenas *duces tecum* served by Plaintiffs on two non-parties who formerly served as Morgan Stanley's Diversity Monitors (the "DMs") – Cathy Pepe and Fred Alvarez – and Alvarez's prior law firm (collectively, the "DM Subpoenas"). (Doc. No. 180.) For their part, Plaintiffs moved to compel Morgan Stanley to respond to certain requests calling for the production of materials pertaining to Morgan Stanley's nationwide employment and compensation policies. (Doc. No. 184.) Most recently, on June 25, 2021, the parties filed a joint letter requesting a pre-motion conference in anticipation of Morgan Stanley's motion for a protective order to prevent service of another subpoena *duces tecum* on Marilyn Booker, Morgan Stanley's Global Head of Diversity from 2004 to 2010 and Head of Urban Markets from 2011 to 2019 (the "Booker Subpoena"). (Doc. No. 189 at 1, 3.) The Court now resolves the parties' motions, as well as several remaining discovery issues raised at the February 18 conference.

## I. Email Production

Plaintiffs have requested that Morgan Stanley produce "Plaintiffs' complete email boxes" for the duration of their respective periods of employment at Morgan Stanley. (*See* Doc. No. 170 at 3.) Morgan Stanley objects, arguing that Plaintiffs' request is "patently overbroad and disproportionate to the needs of this case" (Doc. No. 170 at 5), and that the costs of compliance will exceed $84,400. (Doc. No. 179 at 1.) Although Plaintiffs have offered to pay the costs of processing the email boxes – which they insist can be done for significantly less than $84,000 – such a review will be possible only if Morgan Stanley turns over Plaintiffs' complete, untouched

2

email boxes; this Morgan Stanley refuses to do on the grounds that it must first review every email for relevance and confidentiality issues.[2] (Doc. No. 183 at 1 n.1.)

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, the parties have already negotiated an ESI protocol using search terms based on "Morgan Stanley's, the branches['], and Plaintiffs' own vernacular" to identify the universe of relevant emails without requiring Morgan Stanley to "produce every email ever sent or received by any custodian." (*See* Doc. No. 179 at 2–3.) Although Morgan Stanley has agreed to produce any complaints made by Plaintiffs through Morgan Stanley's "various internal mechanisms," including "human resources, employee relations . . . or diversity monitors" (Doc. No. 177 at 73), Plaintiffs allege that Morgan Stanley has not produced any emails reflecting Plaintiffs' complaints to managers about discriminatory treatment including teaming, account distributions, and client poaching while employed at their branches. (*See, e.g.*, Doc. No. 183 at 3.)

---

[2] In their most recent submission on this issue, Plaintiffs offer an alternative discovery request, asking the Court "to require [Morgan Stanley] to search Plaintiffs' email boxes and the email boxes of the individuals with whom Plaintiffs[] communicated about important events and challenged practices . . . during the 2008–2011 time period using targeted search terms based on discovery to date." (Doc. No. 183 at 3.) Morgan Stanley has not addressed the potential cost of production for this alternative request, which was not previously offered as an alternative to Plaintiffs' initial request for their entire email boxes. (*See* Doc. No. 170.) This request also differs from Plaintiffs' alternative request, proffered at the February 18 conference, for discovery based on "targeted search terms for just the [P]laintiffs' emails" – but not the email boxes of any other custodians – going back to June 2009. (*See* Doc. No. 177 at 76.)

Plaintiffs have changed their discovery requests several times throughout the course of this dispute before the Court, seemingly without further discussion with Morgan Stanley. (*See* Doc No. 186 at 4 n.1). This practice impedes the Court's efforts to understand the scope of the discovery issues at stake and the arguments from both parties with respect to specific discovery requests. To save time and resources going forward, the Court will no longer consider any party's proposed alternatives to discovery requests unless the parties have already discussed those specific alternatives in good faith, or a party can show good cause for failing to do so.

Plaintiffs provide no explanation as to why the prior searches have not led to the production of their alleged complaints, nor have they explained why additional search terms and correspondents would produce their desired discovery results.[3] Moreover, Plaintiffs have not provided any evidence to support their extraordinary assertion that a "majority" of the hundreds of thousands of emails in their email boxes will be somehow relevant to their claims. (*See* Doc. No. 183 at 2.) Thus, while it stands to reason that there may be *some* relevant materials in Plaintiffs' email boxes, the Court has little difficulty concluding that production of their complete email boxes – in addition to the significant ESI discovery that has already been produced under the parties' prior negotiations – will be more burdensome than beneficial. Accordingly, the Court denies Plaintiffs' request for production of additional emails – through new term searches or Plaintiffs' entire email boxes – as overly burdensome and not proportional to the remaining issues in this case.

## II. Motion to Compel Discovery of Nationwide Materials

Plaintiffs move to compel Morgan Stanley to produce "already-prepared studies and reports analyzing Morgan Stanley's firm-wide practices relating to teaming, account distribution and its training program."[4] (Doc. No. 185 at 3; *see* Doc. No. 184.) Plaintiffs assert that these materials may be used to "bolster their arguments that the practices at issue harmed them, that the

---

[3] Plaintiffs do not seem to suggest that Morgan Stanley is withholding relevant emails from its current production, which is based on the parties' agreed-upon search terms. And if Plaintiffs had information about specific complaints made via email during their employment, they should have incorporated such information into the parties' original search terms and protocols.

[4] Specifically, Plaintiffs have sought "EEO-1 reports and affirmative action studies, detailing the demographics of Morgan Stanley's FA and FA Trainee workforce," and "regularly prepared . . . corporate reports and studies [and related ESI] about Morgan Stanley's teaming initiatives, including those that show the general benefits of teaming to FAs, as well as targeted analyses of the racial effects of Morgan Stanley's teaming policies" from 2009–2013; Plaintiffs have also sought similar materials regarding Morgan Stanley's account distribution policies and training program. (Doc. No. 185 at 7–8.) In addition, Plaintiffs have sought "studies, reports or analyses from the Diversity office, including those required by discrimination consent decrees and documents relating to [the Global Head of Diversity's] work during the same 2009–2013 period." (*Id.* at 8.)

4

defendant[s] intended to harm them based on their race, and that any claimed reasons for their mistreatment are thinly-veiled pretexts for discrimination." (Doc. No. 185 at 3.) Morgan Stanley objects to the production of these nationwide studies, reports, and analyses, contending that the requested materials are not relevant to "the alleged intentional, discriminatory acts Plaintiffs claim they suffered from the application of said policies by their managers during their employment." (Doc. No. 186 at 5.) Instead, Morgan Stanley argues that the scope of discovery should be limited to the Plaintiffs' own branches and that Morgan Stanley has already agreed to provide certain documents, studies, and "broad data" relating to those branches. (Doc. No. 181 at 6 n.1; *see* Doc. No. 186 at 7.)

"Motions to compel are left to the court's sound discretion." *Mirra v. Jordan*, No. 13-cv-5519 (AT) (KNF), 2016 WL 889683, at *2 (S.D.N.Y. Feb. 23, 2016). As noted above, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," Fed. R. Civ. P. 26(b)(1), and the Second Circuit has recognized that some company-wide discovery might be relevant to "uncover a pattern . . . which might help prove" a plaintiff's disparate treatment claim, *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990); *see also id.* at 82, 85 (vacating and reversing the district court's decision not to compel discovery limited to identifying "management level employee[s] over forty years old whose employment with the company had terminated" in the 18 months preceding the plaintiff's termination); *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 202–03, 206 (2d Cir. 2014) (vacating and remanding with instructions for the district court to compel discovery "concerning any position . . . eliminated as a result of a reduction in force" decision in four New York offices and all personnel files of employees in three of those offices who held the same job title as the plaintiff).

At the same time, discovery must always remain "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see Malzberg v. New York Univ.*, No. 19-cv-10048 (LJL), 2020 WL 3618962, at *2 (S.D.N.Y. July 2, 2020). Accordingly, "discovery is often limited to a plaintiff's employment department or unit," especially "where the allegations focus on a particular employment action in which decision-making was limited to that plaintiff's employment unit," as is often the case with disparate treatment claims. *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 567 (S.D.N.Y. 2013); *see Sinni v. Forest Hills Hosp.*, No. 09-cv-4572 (SLT), 2011 WL 1004817, at *2–4 (E.D.N.Y. Mar. 18, 2011).

Here, Plaintiffs' broad requests for all nationwide studies and reports analyzing Morgan Stanley's teaming, account distribution, training programs, EEO-1, and affirmative action plans are largely irrelevant or disproportionate to Plaintiffs' remaining individual disparate treatment claims, which allege discrimination by individuals in Plaintiffs' offices. Plaintiffs cite to employment discrimination cases in which courts within this Circuit have compelled discovery regarding specific company-wide actions and similarly situated employees as relevant to whether an employer's non-discriminatory explanation for an allegedly discriminatory action was pretextual. *See, e.g.*, *Moll*, 760 F.3d at 204–05; *Hollander*, 895 F.2d at 83–85. But here, Plaintiffs seek information about an array of practices and policies affecting many, if not all, of Morgan Stanley's employees nationwide over a four-year period. These expansive discovery requests go well beyond the scope of the disparate treatment claims currently before the Court and must be narrowed accordingly.[5]

---

[5] Plaintiffs seem to argue that even if the requested discovery materials will not bear on specific instances of discrimination against them, the materials will be relevant to calculating damages. (*See* Doc. No. 177 at 55.) But Plaintiffs offer no explanation as to why branch-specific data that has already been produced will prove inadequate to calculate Plaintiffs' alleged damages relative to comparators from Plaintiffs' own branches. (Doc. No. 186 at 5–6.)

However, to the extent that Morgan Stanley possesses company-wide *policies* and *guidance* that were available to and potentially considered by supervisors at Plaintiffs' respective offices in making decisions regarding teaming, account distribution, affirmative action, and FA training or retention, those materials are clearly relevant to Plaintiffs' disparate treatment claims and should be produced.[6] Morgan Stanley has not shown that it would be unduly burdened by production of such company-wide policies and guidance from the relevant time period.[7]

Therefore, to the extent that Morgan Stanley has not already done so, the Court directs Morgan Stanley to produce all company-wide policies and guidance that applied with respect to teaming, account distribution, affirmative action, and FA training or retention at Plaintiffs' local offices from June 1, 2009 through November 30, 2013. In all other respects, the Court denies Plaintiffs' motion to compel broader discovery of nationwide materials, which are not relevant or proportional to the remaining disparate treatment claims in this case.

### III. Motion for Protective Order Prohibiting Subpoena Requests

Plaintiffs served the DM Subpoenas in early 2021, requesting "[a]ny and all documents" in the "possession, custody, or control" of the subpoenaed party relating to: each Plaintiff; the DMs' roles as Settlement Monitors for two other discrimination suits brought against Morgan Stanley;[8] and Morgan Stanley's Honolulu, Wilmington, Little Falls, and Greenville branch

---

[6] Whether Plaintiffs' supervisors consistently applied, or deviated from, company policies and guidance could signal whether Plaintiffs were treated differently than similarly situated employees. For example, Plaintiffs allege that Morgan Stanley "made 'exceptions' to its account distribution policy that enabled it to steer accounts to non-African American FAs at Plaintiffs' expense." (Doc. No. 185 at 14; *see also* Doc. No. 183 at 2–3.)

[7] In fact, Morgan Stanley contends that it has already agreed to produce "documents regarding participation in, requirements of, and any benefits, advantages or disadvantages of teams provided to Plaintiffs' branches during the statutory period." (Doc. No. 181 at 9 n.1.) The Court sees no reason why it would be unduly burdensome to provide similar documents regarding account distribution, FA training and retention, and affirmative action plans that were to be applied at the local branch level.

[8] With respect to these other cases, Plaintiffs have sought "documents, reports, analyses, [and/or] metrics . . . received from or provided to Morgan Stanley & Co. or any other individuals in fulfillment of [DM] duties and responsibility as the Diversity Monitor[s] relating to race, gender, EEO-1 reporting, diversity, teaming, compensation, account

offices.⁹ (Doc. No. 182-1 at 5, 9, 13.) Morgan Stanley seeks a protective order to prohibit Plaintiffs from requiring Pepe, Alvarez, and Alvarez's former firm to respond to the DM Subpoenas. Morgan Stanley argues that it has already agreed to produce discovery responsive to Plaintiffs' requests for documents related to "the DM's investigation into Plaintiffs' Honolulu-focused, post-employment complaints, the DM's communications with Plaintiffs and [Morgan Stanley] regarding that investigation, and [Morgan Stanley's] independent investigation report and accompanying analyses;" Morgan Stanley also contends that many of Plaintiffs' requests in the DM Subpoenas are duplicative. (Doc. No. 186 at 6.) Morgan Stanley further asserts that neither the subpoenaed non-parties nor Morgan Stanley should be compelled to produce discovery in response to Plaintiffs' requests for "studies, reports, and investigations, conducted at the national level on account distributions that encompass information on hundreds of other [Morgan Stanley] branches relating to thousands of FAs in geographic areas where Plaintiffs did not work," because such materials are outside the scope of relevant discovery for Plaintiffs' claims. (*Id.*; *see also* Doc. No. 181 at 11, 16–17.)¹⁰

Parties may serve subpoenas on non-parties that require them to produce documents in discovery. *See* Fed. R. Civ. P. 45(a)(1) advisory committee's note to 1991 amendment. And while a party may in some circumstances challenge a non-party subpoena through a motion to quash or

---

redistributions, inherited assets, exceptions to Morgan Stanley's redistribution policies, the Financial Advisor Associate ("FAA") training program, retention of FAAs and conversation from FAA to FA and Joint Production Agreements ("JAPs")." (Doc. No. 182-1 at 5.) Since serving the DM Subpoenas, Plaintiffs have conceded that they will no longer seek information about the DMs' roles related to gender. (Doc. No. 185 at 10 n.3.)

⁹ Plaintiffs have withdrawn their prior requests for "[a]ny communications, including email, text messages, letters, media or other form" between or on behalf of Pepe or Alvarez and Morgan Stanley personnel, including but not limited to Morgan Stanley's Head of Diversity and Inclusion, Morgan Stanley's Head of the Field for Wealth Management, and Morgan Stanley's in-house employment counsel, several other named individuals, as well as "[a]ny records maintained by Cathy Pepe and transferred to [Fred] Alvarez." (*Id.*; Doc. No. 185 at 10 n.3.)

¹⁰ Morgan Stanley also argues that "Plaintiffs have had ample opportunity to obtain the relevant subpoenaed documents directly from [Morgan Stanley] and are using the non-party [DM] Subpoenas as an end-run around the discovery process." (Doc. No. 181 at 17 (citing Fed. R. Civ. P. 26(b)(2)(C)(ii)).)

8

a motion for a protective order, a party ordinarily "lacks standing to challenge a non-party subpoena on the basis of relevance or burden." *N'Diaye v. Metro. Life Ins. Co.*, No. 17-cv-4260 (GBD) (BCM), 2018 WL 2316335, at *4 (S.D.N.Y. May 8, 2018). Instead, the moving party "must assert some right or privilege personal to it, such as an interest in proprietary, confidential information that would be disclosed or an interest in maintaining a privilege that would be breached by disclosure." *Id.* (internal quotation marks and citations omitted). Because Morgan Stanley does not assert a personal right or privilege that would give it standing to challenge the non-party subpoena here, its motion to for a protective order must be denied. *See Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11-cv-1590 (LTS) (HBP), 2013 WL 57892, at *5 (S.D.N.Y. Jan. 4, 2013) (denying motion to quash non-party subpoenas where defendant "made no attempt to establish any proprietary or other confidentiality-related interest it may have in the requested documents beyond a conclusory assertion that the subpoenas seek documents that are 'private, confidential, and commercially sensitive.'").

Even though Morgan Stanley lacks standing to challenge the DM Subpoenas, "Rule 26(b)(2)(C) [of the Federal Rules of Civil Procedure] authorizes a district court to limit discovery 'on . . . its own,'" if the court determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

*N'Diaye*, 2018 WL 2316335, at *4 (quoting Fed. R. Civ. P. 26(b)(2)(C)); *see also Hughes v. Hartford Life & Accident Ins. Co.*, No. 3:19-cv-01611 (JAM), 2020 WL 2615531, at *14 (D. Conn. May 22, 2020) ("In cases where the party lacks standing to challenge a subpoena served on a non-party, the Court may nevertheless exercise its inherent authority to limit irrelevant or non-

proportional discovery."). Given that this case has been pending for more than five years, and in light of the Court's "broad discretion to determine whether a subpoena imposes an undue burden," *Amphenol Corp. v. Fractus, S.A.*, No. 19 Misc. 160 (PAE), 2019 WL 2521300, at *6 (S.D.N.Y. June 19, 2019), the Court will assess the relevance and burdensomeness of the discovery sought in the DM Subpoenas.

In the DM Subpoenas, Plaintiffs seek "related but not identical information to what they sought from [Morgan Stanley]," including reports and analyses shared between the DMs and Morgan Stanley regarding account distribution, training, compensation, and other "policies and practices at issue in this lawsuit," "information about the Plaintiffs themselves," and "information about the branches where Plaintiffs worked." (Doc. No. 185 at 9–10.) Although the DM Subpoenas request discovery that may overlap significantly with discovery from Morgan Stanley, the potential for duplicative discovery does not by itself make a subpoena improper. *See Amphenol Corp.*, 2019 WL 2521300, at *11. And where it is likely that the subpoenaed third parties possess materials that Morgan Stanley does not have, "including [the DMs'] own notes and analyses not provided to Morgan Stanley" relating to Plaintiffs' alleged complaints to the DMs during their employment at Morgan Stanley (Doc. No. 185 at 19), such materials would be highly relevant to Plaintiffs' remaining claims. (*See* Doc. No. 185 at 14.)

To the extent that the DM Subpoenas request production of the same nationwide discovery that Plaintiffs sought from Morgan Stanley, the Court imposes the same limits on the DM Subpoena requests as it imposed in Part II. Consistent with that determination, the non-parties served with the DM Subpoenas are to produce only materials directly related to the individual Plaintiffs or their local offices concerning teaming, account distribution, affirmative action, and

FA training and retention decisions made, or policies or guidance that applied, in those offices between June 1, 2009 and November 23, 2013.

* * *

IT IS HEREBY ORDERED that Plaintiffs' motion to compel discovery is GRANTED in part and DENIED in part, and Morgan Stanley's motion for a protective order is DENIED because Morgan Stanley lacks standing to bring such a motion; nevertheless, the Court invokes its authority to limit the scope of discovery and directs Plaintiffs to narrow their requests in each DM Subpoena to comply with the limits set forth in Part III above. The discovery limits imposed on the DM Subpoenas shall apply equally to the Booker Subpoena that Plaintiffs intend to serve; the Court therefore directs the Plaintiffs to modify their requests to align with these limits before serving the Booker Subpoena.[11] In light of this determination, the Court denies the parties' joint request for a pre-motion conference. (*See* Doc. No. 189.) If the parties confer and determine that a conference is still necessary despite the Court's instruction on the limits of Plaintiffs' requests in the Booker Subpoena, they may file a joint letter explaining their reasoning and requesting a conference. IT IS FURTHER ORDERED that the parties shall confer and jointly submit a revised case management plan by Wednesday, July 14, 2021. The Clerk of the Court is respectfully directed to terminate the motions pending at Doc. Nos. 173, 180, 184, 187, and 189.

SO ORDERED.

Dated:	June 30, 2021
	New York, New York

	_____
	RICHARD J. SULLIVAN
	UNITED STATES CIRCUIT JUDGE
	Sitting by Designation

---

[11] Plaintiffs may request from Ms. Booker only materials directly related to the individual Plaintiffs or teaming, account distribution, FA training and retention, and affirmative action decisions made, or policies or guidance that applied, in Plaintiffs' offices between June 1, 2009 and November 23, 2013.

11